**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MAX A. RADY,<br><br>    Plaintiff,<br><br>    v.<br><br>ANGLO AMERICAN US HOLDINGS INC.,<br>DE BEERS PLC, D/B/A DE BEERS GROUP,<br>ANGLO AMERICAN PLC, DE BEERS<br>JEWELLERS (US), INC., DE BEERS UK<br>LIMITED, SIGNET JEWELERS, ORIGYN<br>RESEARCH USA LLC PAN INDUSTRIAL<br>PLATFORMS LLC, AND PAN INDUSTRIAL<br>SERVICES LLC,<br><br>    Defendants. | C.A. No. 1:26-cv-00767-CFC |

### AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND CORRECTION OF INVENTORSHIP

Dr. Max A. Rady ("Dr. Rady"), by his attorneys, Whiteford, Taylor & Preston LLP and, respectfully files this Complaint against Defendants De Beers PLC d/b/a De Beers Group ("De Beers"), Anglo American US Holdings Inc.,[1] Anglo American PLC, De Beers Jewelers, Signet Jewelers ("Signet"), Origyn Research USA LLC ("Origyn "),  Pan Industrial Platforms LLC, and Pan Industrial Services LLC (Pan Industrial Platforms LLC, and Pan Industrial Services LLC, collectively "Pan Industrial" or "the Pan Industrial Companies"), for direct and indirect patent infringement, and De Beers UK Limited for correction of inventorship, and alleges as follows:

### OVERVIEW

*Background: Failure of the Diamond Industry to Reliably Identify, Track , and Trace the*

*Progeny of Diamonds*

---

[1] Anglo American US Holdings INC. is a wholly owned subsidiary of Anglo American PLC and is the corporate representative for Anglo American PLC businesses in the USA.

1.      This lawsuit relates to the long felt need for a technical solution to reliably identify and authenticate real-world physical objects even if they undergo modification without the need for external markers such as RFIDs, microchips, serial numbers or barcodes which are highly susceptible to fraud/forgery, duplication and swapping.  Furthermore, in the case of gemstones/diamonds, the fact that rough diamonds undergo modification/change shape during their lifecycle after being cut into one or more smaller stones made it impossible to link the progeny of individual cut/polished/finished stones to the rough stone from which they were cut. The invention and the patents that are subject of this lawsuit provided a technical solution to solve these problems. De Beers conglomerate and the company it hired to solve its diamond provenance problem, the Boston Consulting Group ("BCG") willfully and deliberately misappropriated the invention to develop De Beers' Tracr platform and the diamond scanning machines required for the platform to create a true one-to-one physical to digital representation/ high fidelity 3D map and unique fingerprint for individual rough and cut/polished stones based on each stone's intrinsic characteristics (self-provenance), and to trace the progeny of each cut/polished stone to the specific rough stone from which it was cut eliminating the need for falsifiable declaratory paperwork,  laser engravings and serial numbers. Dr. Rady has obtained several patents for his invention, including the patents asserted herein, U.S. Patents No. 12,375,261, 12,401,496, 12,580,734, and 12,683,762 Exhibits 1, 2,  3, and 4, respectively. Meanwhile, De Beers has made Dr. Rady's invention central to its businesses, infringing Dr. Rady's invention on a massive scale. Indeed, De Beers has made Dr. Rady's invention central to their new business model, even going so far as to file for and obtain U.S. Patents taken directly from Dr. Rady's confidential disclosures to BCG. And BCG has spun off several companies whose primary purpose is to leverage Dr. Rady's invention across a host of industries.

## PARTIES

2. Dr. Rady is a citizen of the United States of America currently residing in France.

3. Anglo American US Holdings Inc is a Delaware corporation owned by Anglo American PLC.

4. Origyn Research USA LLC is a Delaware corporation having an office at 621 6th Street, Manhattan Beach, California 90266.

5. Pan Industrial Platforms LLC is a Delaware corporation. Pan Industrial Services LLC is a Delaware corporation.

6. De Beers PLC d/b/a De Beers Group is a corporation formed under the laws of the Bailiwick of Jersey. De Beers specializes in diamond exploration, mining, and trading as well as wholesale and retail sale of diamonds.

7. Anglo American PLC is a British mining company, the parent company of co-defendant De Beers, with headquarters in London, England. Anglo American PLC is a publicly traded company listed on the London Stock Exchange. On information and belief, Anglo American PLC imports ores and metals to refineries and processors throughout the U.S. Anglo American PLC owns, promotes, and operates the "Valutrax" traceability platform, a version of Tracr adapted for metals and minerals, which it markets and sells to mining, smelting, refining, and trading companies in the United States.

8. De Beers Jewelers (US), INC. is a Delaware corporation owned by De Beers Group, with retail locations throughout the United States.

9. Signet Jewelers Limited is a corporation formed under the laws of Bermuda, and owns and operates numerous branded retail locations (throughout the U.S., including in this District. Signet Jewelers Limited also controls numerous subsidiaries and affiliates that are incorporated in this District.

10.     De Beers UK Limited is a British company having an address at 17 Charterhouse Street, London, United Kingdom, EC1N 6RA. De Beers UK Limited is the named Applicant and Assignee-of-Record of U.S. Patent No. 11,893,809 and U.S. Patent No. 12,354,384 that incorrectly name Qi He Hong as inventor and incorrectly omit Dr. Max Rady as the correct and sole inventor.

11.     The claims herein against these defendants share an aggregate set of operative facts, namely the theft of Dr. Rady's patented invention by BCG and De Beers, the use of Dr. Rady's patented invention by BCG and De Beers to develop the Tracr platform ("Tracr," "Tracr Platform," "Tracr Technology," and "Tracr Solution") and diamond scanning machines required for the platform, the filing by De Beers of patent applications for Dr. Rady's invention, but failing to name Dr. Rady as the proper and sole inventor, the launch of the Tracr platform by BCG and De Beers for diamond registration, identification, authentication and tracking for the diamond industry, the launch by a BCG partner of a Tracr-rebranded "Origyn" program and the Origyn Minting Box to exploit Dr. Rady's invention for second hand luxury goods, the launch by De Beers' parent company Anglo American of its Valutrax platform, a Tracr clone, to exploit Dr. Rady's invention for tracking the provenance and ethical sourcing of metal ores, minerals and its platinum jewelry, and finally, the launch of BCG's IoT Sensor Box to sell Dr. Rady's invention to its customers who already have some, but not all parts of his invention and who need BCG's IoT Sensor Box to implement Dr. Rady's invention. None of the infringing devices accused herein were independently developed. All of the scanning machines alleged herein to infringe Dr. Rady's patents were developed by, on behalf of, or in concert with BCG, De Beers, its current or former employees or partners using Dr. Rady's patented invention.

12.     The earliest of the infringers, De Beers, Origyn and Anglo American created a web of business-related entities and subsidiaries to shield themselves from legal responsibility and to make it difficult for Dr. Rady to hold them accountable for infringement.  Moreover, these

defendants widely publicized the features of their infringing devices initially. However, following an earlier lawsuit filed by Dr. Rady for infringement of the first of his patents to issue, these defendants removed much if not all of this material from public view and began to conceal, obscure, and/or disguise the operational details of their infringing devices and systems. Accordingly, much of the evidence presented here was collected prior to Defendants' efforts to conceal their activities.

**JURISDICTION AND VENUE**

13.     This Court has exclusive subject matter jurisdiction over Dr. Rady's claims pursuant to federal question jurisdiction, 28 U.S.C. §§ 1331 and 1338(a) and (b).

14.     This Court has personal jurisdiction over each Defendant. With respect to defendants incorporated in Delaware (Anglo American US Holdings INC, Origyn Research USA LLC, Pan Industrial Platforms LLC, Pan Industrial Services LLC, and De Beers Jewellers (US), Inc.), this Court has general jurisdiction. With respect to the remaining defendants, this Court has specific personal jurisdiction as set forth in detail in the following paragraphs.

15.     This Court has specific personal jurisdiction over De Beers PLC d/b/a De Beers Group because De Beers has purposefully directed its activities at the United States and this Judicial District. De Beers manufactures, imports into the United States, promotes, offers for sale, sells, and uses infringing diamond scanning machines throughout the United States, including in this Judicial District. De Beers sells and ships diamonds into this Judicial District, operates retail locations through its subsidiary De Beers Jewellers (US), Inc. (a Delaware corporation), actively promotes the Tracr platform to U.S. participants including Signet Jewelers (which operates retail stores in this District), and has directed its executives to lobby the U.S. government on diamond sourcing and provenance issues. De Beers' CEO visited the White House to promote Tracr, and De Beers trained Signet's 20,000 U.S. sales associates in the use of the Tracr platform and

infringing scanning machines. Dr. Rady's claims arise directly out of De Beers' forum-directed activities, namely the importation, promotion, sale, and use of infringing scanning machines in the United States and this District.

16.    This Court has specific personal jurisdiction over Anglo American PLC because Anglo American has purposefully directed its activities at the United States and this Judicial District. Anglo American owns, promotes, and operates the Valutrax traceability platform, a Tracr clone, which it markets and sells to mining and metals companies in the United States. Anglo American imports into the United States, offers for sale, and sells infringing scanning machines required for participation in Valutrax to U.S. companies, including mining, smelting, refining, and trading companies operating in the United States. On information and belief, Anglo American has U.S.-based customers participating in Valutrax, including companies that import, process, and trade metals in the United States. Anglo American also directs infringing activities at the United States through its ownership and control of De Beers, a co-defendant in this action, whose infringing diamond scanning machines and Tracr platform are marketed, imported, sold, and used throughout the United States and in this Judicial District. Anglo American's own publications state that its 'digital traceability journey began in 2018, with De Beers' investment in Tracr.' Dr. Rady's claims arise directly out of Anglo American's forum-directed activities.

17.    This Court has specific personal jurisdiction over Signet Jewelers Limited because Signet has purposefully directed its activities at the United States and this Judicial District. Signet owns and operates numerous branded retail jewelry stores throughout the United States, including in this Judicial District, under the Kay Jewelers, Zales, Jared, and Blue Nile brand names. Signet also controls numerous subsidiaries and affiliates that are incorporated in Delaware. Signet imports infringing diamond scanning machines into the United States, distributes them to its retail locations throughout the United States including in this District, and uses infringing scanning machines in

its retail stores in this District. Dr. Rady's claims arise directly out of Signet's forum-directed activities.

18.    This Court has specific personal jurisdiction over De Beers UK Limited because De Beers UK Limited has purposefully availed itself of the privileges and protections of United States law. De Beers UK Limited is the named Applicant and Assignee-of-Record of U.S. Patent No. 11,893,809 and U.S. Patent No. 12,354,384. De Beers UK Limited affirmatively filed patent applications in the United States Patent and Trademark Office, prosecuted those applications before the USPTO, obtained the resulting U.S. patents, and holds legal title to those patents as Assignee-of-Record. By filing for and obtaining U.S. patents, De Beers UK Limited purposefully availed itself of the benefits and protections of U.S. patent law and invoked the jurisdiction of U.S. government agencies.

19.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).

20.    Origyn may be sued in this district because Origyn is incorporated in this District

21.    The Pan Industrial Companies likewise may be sued in this district because are incorporated in this District.

22.    De Beers Group may be sued in this district because it is subject to specific personal jurisdiction in this District as set forth above. De Beers engages in regular business activities in this Judicial District, including selling and shipping diamonds into this District, importing infringing diamond scanning machines for use by U.S. participants in the Tracr platform, and directing its subsidiaries to use infringing scanning machines in retail locations in this District. Venue is proper as to De Beers Group in this District pursuant to 28 U.S.C. § 1391(c)(3) because De Beers Group is a foreign entity not a resident of the United States and thus may be sued in any judicial district.

23.     Anglo American PLC may be sued in this district because it is a foreign entity subject to specific personal jurisdiction in this District as set forth above. In addition, venue is proper as to Anglo American PLC in this District pursuant to 28 U.S.C. § 1391(c)(3) because Anglo American PLC is not a resident of the United States and thus may be sued in any judicial district.

24.     De Beers Jewelers may be sued in this district because it is incorporated in this District.

25.     Signet Jewelers Limited may be sued in this district because it engages in regular business activities in this Judicial District, and because it commits acts of infringement (imports and uses infringing diamond scanning machines). Venue is proper as to Signet Jewelers Limited in this District pursuant to 28 U.S.C. 1391 because Signet Jewelers Limited is a foreign company not a resident in the United States and thus may be sued in any judicial district.

26.     De Beers UK Limited may be sued in this district because it is subject to specific personal jurisdiction in this District as set forth above. De Beers UK Limited also filed patent applications in the U.S. Patent and Trademark Office and obtained U.S. Patent Nos. 11,893,809 and 12,354,384, thereby purposefully availing itself of the protections of U.S. law. Tracr is being promoted, offered for sale and sold throughout the U.S., including in this District. Venue is proper as to De Beers UK Limited in this District pursuant to 28 U.S.C. § 1391(c)(3) because De Beers UK Limited is a foreign entity not a resident of the United States and thus may be sued in any judicial district.

**FACTS COMMON TO ALL COUNTS**

27.     The patents that are the subject of the infringement claims in this lawsuit are directed to a pioneering apparatus, system, and method for irrefutably determining and confirming the provenance, identity and authenticity of a physical object based on its own inherent physical

features (self-provenance), no matter how identical it may appear even upon expert inspection even if the object undergoes modifications. All physical objects have inherent surface and sub-surface physical features (impurities, scratches, flaws, anomalies, etc.) that distinguish them from all other physical objects in the world, even nearly identical mass produced objects that come off a manufacturing assembly line one after the other. The invention in the patents asserted in this case uses high resolution scanning devices to scan an object, for example, a diamond, a watch, a handbag, or a computer chip.

28.    The invention in the patents utilizes a coordinated physical array consisting of spectral imagers and, optionally,  3D scanners.[2] These hardware components cooperate to dynamically scan and measure an object, capturing a multidimensional matrix of raw physical, geometric, and material data streams. The apparatuses, systems, and methods of the invention are uniquely configured to process these raw data streams to generate a high fidelity 3D map made of thousands, tens of thousands, or even millions of points of physical features of the object, showing all of the impurities, scratches, flaws, anomalies, etc. that were detected to create a unique digital fingerprint for the object. [3] Crucially, this 3D map is not limited to capturing easily alterable surface-level visual characteristics. Instead, the system penetrates the exterior boundaries of the target object mapping all subsurface physical features of the imaged object, identifying surface and sub-surface physical features and computing all triplet combinations and relative distances (which creates geometric triangles or invariant configurations) between these physical features. Because the digital fingerprint is derived directly from the surface and subsurface structural and

---

[2] Spectral imaging (capturing wavelengths across the electromagnetic spectrum) and 3D scanning (generating point clouds or depth maps) require physical sensor interactions with light, objects, or environments.

[3] The 3D maps and unique identifiers that are generated by the invention are sometimes referred to by various different names, including "digital fingerprint," "fingerprint," "signature," "unique signature," "Tracr ID," "Stone ID," "Global Diamond ID," "UUID (universal unique identifier)," "digital twin," "digital replica," "NFT(non-fungible token)," "tokens," "digital product passport," "digital passport," and "virtual twin."

material characteristics of the object, the resulting digital signature is exceptionally robust. The system successfully creates the digital fingerprint and uniquely identifies the object even if the object has been physically modified, degraded, scratched, or weathered. This specific configuration unconventionally combines different hardware sensors to measure and fuse data of tangible physical objects to achieve an entirely new physical capability: tag-less, modification-resistant tracking solving a critical vulnerability in traditional security infrastructures, which fail completely when an item's surface appearance is altered.

29. Moreover, the 3D map generated by the invention and patents that are the subject of this lawsuit is a high fidelity true one-to-one digital replica of an imaged real-world physical object whether it is a gemstone, real-estate, art piece or a collectible, allowing companies to uniquely identify each individual product and components throughout their life cycles. The one-to-one digital replica, enabled/allowed for the first time the digitization of real-world objects/real-world assets (RWAs) based on their own inherent physical features (self-provenance) without the need to rely on proxies, overcoming the critical technical hurdle of creating digital assets that mirror the real-world objects/assets and reliably linking the physical object to its digital counterpart for physical object identification and authentication,  simulation, quality control, predictive maintenance, manufacturing optimization, and tokenization of real-world objects/assets.

30. Because no two physical objects in the world are exactly alike, that unique digital fingerprint can be used to irrefutably confirm or refute the identity of any subsequently scanned object. That is, if a designer handbag is scanned immediately upon completion of its manufacture, its genuineness, even if it has acquired additional physical features through use, e.g., scratches, stains, etc. or has undergone repair, can be verified at a later date using a subsequent scan, for example at a retail location because , it will still retain many of the physical features that were present when it was initially scanned. Similarly, if a rough diamond is scanned as it comes out of

a mine, a later scan of a cut and polished diamond can be used to determine whether the polished and cut diamond originated from a particular rough diamond because a cut and polished diamond will still have some of the physical features (flaws, inclusions, etc.) of the rough diamond from which it was cut. In order to increase the reliability and speed of the comparison between two digital fingerprints, each unique digital fingerprint includes, in addition to the thousands (or more) of points that make up the 3D map , every possible set of triplets (triangles) that can be made from the set of points. Comparing the set of triplets in one unique signature to the set of triplets in another unique signature increases both the reliability and speed of the comparison. Moreover, the use of the triplets in conjunction with virtual orientation techniques overcomes the posedness and orientation of an object limitation specially when an object lacks a clear upward orientation (i.e., rough diamonds might not have an upward orientation) and the limitation of having to know or place an object in the same way every time it is being imaged or when comparing two objects.

31.     Conventional identification and authentication is fundamentally dependent on attaching a vulnerable, secondary physical marker to an object. The claimed invention (apparatuses systems and methods) replaces this flawed paradigm by turning the object's intrinsic, atomic, and structural composition into the tag itself, creating a novel, non-invasive, non-destructive, non-contact, "tag-less" identification architecture that relies on using spatial and spectral surface and sub-surface features to create a unique fingerprint for the object  providing a structural and systemic security upgrade by removing the need for easily falsified external physical markers.

32.     Prior to the invention, 3D surface scanners could not, and still cannot, maintain the identity of an object if its outer surface was physically altered, cut, or ablated. Standard imaging systems were physically incapable of penetrating material surfaces to map stable, unalterable internal properties. The claimed invention solves this physical limitation through a novel architecture that fuses spatial data from a 3D scanner with spectral data from a spectral imager,

generating a multi-layered 3D spectral-spatial map for the object. The system then computes all possible triplets of surface and sub-surface features from the physical inputs generated by the synchronized spectral imager and 3D scanner interacting with the physical features and material impurities of the physical object. The computation and use of all possible triplet configurations to maintain part-to-whole object identity across a destructive manufacturing process was not well-understood, routine, or conventional in the imaging, gemological, or data processing fields at the time of the invention.

33.     Prior to the invention and patents that are the subject of this lawsuit, the diamond industry long struggled with keeping illegally sourced diamonds and blood diamonds from entering the global supply chain. The fact that rough diamonds undergo modification/change shape during their lifecycle made it impossible to track each rough diamond after it was modified into one or more cut/polished/finished diamonds. It was likewise impossible to trace the lineage of individual cut/polished/finished diamonds back to the rough diamonds from which they were cut.[4]

34.     For decades, the diamond industry relied on the **Kimberley Process Certification Scheme** (**KPCS**) for rough diamonds, a bag and tag/parcel method for batches of rough diamonds in conjunction with a "Kimberly" paper certificate to certify that a batch of diamonds was ethically mined. However, the KPCS method was found to be ineffective in preventing so-called "conflict" or "blood" diamonds from entering the global diamond supply chain because Kimberly certificates were being falsified. In addition, illegally sourced rough diamonds and blood diamonds were

---

[4] The inability to determine and trace the lineage of cut/polished/finished diamonds back to the specific parent rough diamonds was further exacerbated by the winding and opaque nature of the global diamond trade. Rough diamonds are usually transported from their country of origin (where they were mined) to diamond manufacturing and processing hubs in different countries. Once those diamonds are processed, cut and polished in a second country, different from the country of origin, they are considered by the United States government, and by other countries/governments, to be "substantially transformed", and are deemed as a product of that second country and not a product of the country where they were mined. Therefore, once rough diamonds were processed there was no available technical solution to prove that the cut/polished/finished diamonds were the progeny of legally sourced rough diamonds.

mixed with batches of ethically sourced diamonds, making verification of their source all but impossible.[5]

35.     For the identification and tracking of polished/finished diamonds, the diamond industry relied on information contained in grading reports issued by diamond certification houses such as the Gemological Institute of America (GIA), the Gemological Science International (GSI) and the International Gemological Institute (IGI). The information contained in these reports included a serial number engraved/inscribed on the polished/finished stone, together with the 4Cs (cut, color, clarity and carat) and external measurements of the polished/finished diamond.

36.     Using the grading reports to track polished/finished diamonds is not reliable because the serial number engraved/inscribed on the polished/finished stones can be removed by a diamond polisher (for example in the event of a theft), rendering the stones unidentifiable by the police/authorities and insurance companies because the 4Cs and the external measurement of the polished/finished stones do not uniquely identify each individual polished/finished stone in the absence of the serial number. Moreover, the information contained in grading reports could not determine or trace the progeny of the cut/polished diamonds.

37.     Thus, the known methods for diamond identification, authentication and tracking failed to provide a reliable, verifiable, and non-invasive solution to uniquely identify, authenticate and trace each individual rough diamond from mine to customer or to trace the progeny of individual finished stones back to the specific rough stones from which they were cut. The known methods for diamond authentication and tracking are all susceptible to fraud/forgery, duplication

---

[5] The failure of the KPCS was highlighted in August 2010, when Africa's highest-ranking diamond official and a key draftsman of the Kimberly Process, African Diamond Council (ADC) and African Diamond Producers Association (ADPA) Chairman Dr. M'zée Fula Ngenge ("Dr. Ngenge"), persuaded African diamond-producing nations to renounce their support for the scheme. Dr. Ngenge blasted the Kimberly Process ("KP") for its ongoing ineffectiveness, stating that "the system has failed to thwart trading of diamonds mined as a result of human suffering". In February 2023, Dr. Ngenge contacted Dr. Rady to discuss with him his invention and solicit his professional assessment of the diamond traceability solutions provided by De Beers and several 3rd parties.

and swapping, and they are wholly insufficient for irrefutably tracing of the progeny of rough diamonds or the origin of cut and polished stones.

38.     For decades, the global gemstone industry relied on paperwork, auditable chains of custody, or laser-etching serial numbers onto the surface of a finished stone—all of which are highly vulnerable to fraud. Mapping *subsurface* physical structures to create a modification-tolerant digital fingerprint was an entirely non-conventional engineering approach. The claimed invention completely replaces external tracking by reading the unchanging, subsurface DNA of a stone to establish rough-to-polished progeny.

39.     In the high-value gemstone supply chain, tracking and authentication has traditionally been impossible once a gemstone undergoes geometric transformation through the disruptive cutting and polishing process. Because the external shape, facets, and surface geometry change entirely, traditional visual metrics, serial numbers, or external tags are destroyed during manufacturing. The claimed invention solves this long-standing industrial bottleneck through an innovative multi-sensor architecture. By utilizing one or more imagers, the system generates a comprehensive 3D map that captures both the external topography and the internal, subsurface physical structures and material inclusions of a rough gemstone, identifying all surface and sub-surface physical features and computing all triplet combinations and relative distances (which creates geometric triangles or invariant configurations) between these physical features. Because these subsurface physical features and material signatures remain structurally locked inside the stone throughout the manufacturing process, they are invariant, so when a rough stone is cut into multiple smaller stones, the children stones will contain some of the triplet combinations of the parent stone. The inventions use this multi-layered structure to create a digital fingerprint capable of unequivocally identifying that a specific polished gemstone was cut from a specific rough gemstone**.** By mapping these unalterable subsurface characteristics, the inventions establish

absolute, tamper-proof self-provenance across the entire lifecycle of the material, surviving radical physical modifications, maintaining an object's identity and overcoming physical transformation of tangible objects.

40.     The disadvantages of the known methods for identification, authentication and tracking are not limited to diamonds and other gemstones. Manufactured goods in various industries including electronics, pharmaceutical, automotive, aerospace, defense, and luxury goods, are plagued with counterfeiting problems due to the lack of a verifiable and irrefutable mechanism to identify and trace genuine products, exposing manufacturers, distributers, retailers and consumers to heightened risks from counterfeit drugs, fraudulent materials and defective parts. These risks drive up costs, erode revenues, and damage reputations and brands.

41.     Unlike conventional systems that require the attachment and scanning of external, forgeable physical markers—such as RFIDs, microchips, or barcodes, which are susceptible to fraud/forgery, duplication and swapping, and they cannot be relied upon when an object has been modified or for determining whether an object has been modified, the claimed invention represents a paradigm shift in identification and authentication technology. By utilizing one or more imagers, the apparatuses, systems, and methods of the invention transform the intrinsic, surface and sub-surface material characteristics of the object itself into a secure, tag-less digital fingerprint, thereby eliminating the physical vulnerabilities and manufacturing overhead of traditional tracking metrics, allowing a physical object to autonomously (self-provenance) verify its own identity even if it is modified.

42.     In 2017, De Beers Group, the largest diamond producer in the world, suffering from negative public reputation due to contamination of its diamond supply by blood/conflict diamonds, in an attempt to improve its negative public image decided to find a way to reliably establish the provenance of its diamonds and track their diamonds through the entire diamond lifecycle from

rough to cut to polished to customer, but struggled to find a solution. De Beers engaged the services of The Boston Consulting Group ("BCG") to develop a solution to identify, authenticate and track diamonds through the entire supply chain. However, as late as January 2018, the CEO of De Beers said that the solution was difficult to find and had not yet been found. See ¶59, below.

*Dr. Rady invented the solution for reliably identifying and tracing the progeny of diamonds*

43.     In 2014, Dr. Rady (still just Mr. Rady at the time) who studied optics, optical properties, light matter interaction, photonics, spectroscopy, physical based rendering, 3D and statistical modeling and analysis for predictive rendering related to dielectric and conductor materials, including gemstones, metals, and glass, was working to develop an improved method for physical based computer rendering of scenes, all of which have broad applications in nearly all industries. Physical based rendering (computer based rendering of things, including scenes, objects, buildings, landscapes, etc., that is "photorealistic"), is used in industries such as advertising, television and film, and video games. Dr. Rady developed a scheme for comparing multiple renderings of an identical scene or object using different processors to verify the results of his work. The purpose of Dr. Rady's scheme was to maintain relatively low rendering times (roughly 1 to 1.5 hours per scene) by allowing him to use the full computational power using multiple cores and threads available to him (Dr. Rady built his own workstation to carry out his rendering work), instead of using a single core and single thread which would increase the rendering times by six to nine-fold (6 to 13 hours per scene). Dr. Rady realized that the scheme he developed to compare multiple computer-rendering of identical scenes and objects had real-world applications beyond the verification of the like-for-like rendering.

44.     In June 2016, Dr. Rady was hired as a senior engineer by BCG in London, UK, and assigned to BCG Digital Ventures ("BCG DV") where he was tasked with projects for two of

BCG's French corporate clients. One of these projects related to vehicle toll-booth classification and another related to smart factories and cement truck routing.

45.     In March 2017, Dr. Rady attended a monthly BCG DV engineers' meeting in which upcoming client engagements and the state of current client engagements and staffing are discussed. At this meeting, Dr. Rady's supervisor, Matt Sinclair ("Mr. Sinclair"), reported that BCG DV was in discussions for onboarding De Beers as a client to develop a method for establishing diamond provenance and tracking, among other things.

46.     Shortly thereafter, realizing that the contemplated project for De Beers could benefit from the developments he had made during his work on physical based rendering, Dr. Rady told Mr. Sinclair about the method that he had developed for comparing identical rendered scenes., Dr. Rady explained the method, how it could be used to establish the provenance of and track diamonds and that he was considering filing a patent application. Specifically, Dr. Rady explained how 3D scan data and spectral data could be used to identify points in 3D coordinate space corresponding inclusions, occlusions, and other physical features of a diamond. Dr. Rady further explained how a set of these points could allow for the unique identification of diamonds, and how using triplets of these points could be used to quickly trace a diamond from rough to polished. Mr. Sinclair exclaimed that Dr. Rady is "a genius" and had just "solved the problem of asset self-provenance."

47.     Two weeks later, Mr. Sinclair telephoned Dr. Rady late on a Friday afternoon and told him to "bury it" and not to discuss his invention with anyone at BCG. Dr. Rady believes that he received this call from Mr. Sinclair because BCG had inked the deal with De Beers and did not want to rely on an "outside" solution for the De Beers project.

48.    In April 2017, De Beers engaged the services of BCG for the ideation[6], research and development, scoping, and prototyping of hardware for the identification, authentication, and tracking of diamonds. BCG's Digital Ventures ("DV") division was initially assigned to the project which was given the name "Project Midnight."

49.    In May 2017, Dr. Rady was assigned to work in BCG's Paris office on a project known as "Cyclope." Cyclope related to the development of an artificial intelligence and computer vision application for motor vehicle toll-booth classification and roadway accident detection in France.

50.    On October 20, 2017, following a presentation by Dr. Rady about his work on Cyclope at the BCG Gamma[7] worldwide event in New York City, Andrea Gallego ("Ms. Gallego"), a Partner and Chief Technology Officer with BCG's Gamma business unit, asked Dr. Rady to join her as a co-founder for a new project known as "Source." Source is the first BCG branded proprietary product and involved the development of an artificial intelligence analytic engine to assist data scientists to produce production-ready computer code.

51.    During his interview for project "Source", Dr. Rady advised Ms. Gallego, as well as Seshadri Iyer ("Mr. Iyer"), a Managing Director and Senior Partner at BCG Gamma, that he had invented a system and method for uniquely identifying, tracking and establishing provenance of real-world physical items (including diamonds) and would soon be filing a patent application for his invention. All of the work performed by Dr. Rady toward researching and developing this innovative system was performed outside the scope of his employment at BCG.

---

[6] BCG uses the term "ideation" to refer to the creative process of generating new ideas for clients once a client is onboarded, typically aimed at solving a client problem, and/or developing new client products or services.

[7] BCG Gamma is a subdivision of BCGX whose primary focus lies in the use of artificial intelligence, machine learning and advanced data analytics to solve business problems.

52.    Dr. Rady accepted Ms. Gallego's offer and began his role as a senior analytics software developer working with Ms. Gallego within BCG Gamma in November 2017, in Paris, France.

53.    Dr. Rady filed Provisional Patent Application No. 62/609,783 for his invention at the U.S. Patent and Trademark Office on December 22, 2017. Exhibit 5.

54.    BCG DV was unable to solve the De Beers diamond identification and tracking problem after seven months of effort. Around November 2017, the BCG Gamma division was brought in to try find a solution.

55.    Sometime around the beginning of January 2018, Ms. Gallego recalled that Dr. Rady had told her of his invention concerning diamond identification and tracking, and she told Dr. Rady that BCG's Project Midnight was facing significant challenges and was significantly behind schedule. Ms. Gallego urged Dr. Rady to contact Sylvain Duranton ("Mr. Duranton"), head of the BCG's Gamma business unit, stating that Dr. Rady might be able to assist with the development of a solution for De Beers given the subject matter of his invention and patent application. On January 8, 2018, Dr. Rady contacted Mr. Duranton to schedule a meeting.

56.    On January 9, 2018, Dr. Rady met with Mr. Duranton in BCG's offices in Paris to discuss his invention and patent application. Prior to disclosing any details of his invention and unpublished pending patent application, Dr. Rady asked Mr. Duranton to provide assurance that the technology he disclosed would be maintained in confidence by BCG. Mr. Duranton agreed that BCG would not disclose any details about Dr. Rady's invention to any third party or use the information for any purpose without Dr. Rady's consent.

57.    During this January 9, 2018, meeting, Dr. Rady provided Mr. Duranton with details about his invention for uniquely and irrefutably identifying real-world physical items based on their own inherent physical and chemical characteristics (self-provenance). More specifically, Dr.

Rady explained the use of 3D scan and spectral data to identify points in 3D coordinate space that correspond to inclusions, occlusions, and other physical features of each diamond and the gathering of these points into a set of triplets to generate a unique signature for each rough, cut, and polished diamond which would permit the tracing of each diamond from rough to polished. Dr. Rady explained how his invention allows for the unique identification of each rough/cut/polished diamond and definitively establishes the lineage (parent-child relationship) between a specific rough stone and the finished stones cut from that specific rough stone. Dr. Rady also explained how his invention is applicable to real-world items in other asset classes.

58.     Mr. Duranton was extremely impressed and told Dr. Rady that his invention would be very valuable for many industries including the diamond industry and that Dr. Rady could likely license his technology and invention to a number of third parties. Dr. Rady agreed with Mr. Duranton and said that he would be interested in a licensing relationship to help BCG advance the De Beers project. Mr. Duranton told Dr. Rady that he would advise Arun Ravindran ("Mr. Ravindran"), a Partner and Associate Director at BCG Gamma, and Romain De Laubier ("Mr. De Laubier"), a Managing Director and Partner at BCG Gamma, who were leading the Gamma team assigned to Project Midnight, to contact Dr. Rady to discuss BCG's possible licensing of his technology and invention for Project Midnight.

59.     On January 16, 2018, in two separate publications, Mr. Bruce Cleaver ("Mr. Cleaver"), Chief Executive Officer of De Beers Group, admitted the difficulties De Beers was having solving the problem of how to digitally track diamonds and link a polished diamond back to the rough stone from which it was derived, noting that "rough diamonds can be cut into multiple polished stones" and that De Beers hadn't yet worked out how to ensure the same stone is digitally tracked, saying "**We've spent a lot of time thinking about how you can triangulate the polished**

**back to the rough . . . That's the area that's going to require the most amount of work,"**[8] and **"tracking a cut and polished stone back to its original source is one of the hurdles that De Beers has yet to surmount**."[9] However, miraculously less than two months of BCG receiving Dr. Rady's then unpublished patent application, Project Midnight was completed, and De Beers was able to track and trace the lineage of rough and polished diamonds from mine to finger.

60.    Between January 18, 2018, and February 6, 2018, Dr. Rady had numerous meetings, email exchanges, and phone calls with Mr. Ravindran in which:

- Mr. Ravindran contacted Dr. Rady to discuss how BCG could use his invention for the De Beers project Exhibit 7, and Dr. Rady repeated the description he provided to Mr. Duranton regarding his invention, using 3D scan data and spectral data to identify points in 3D coordinate space that correspond to inclusions, occlusions, and other physical features of each diamond, determining a series of triplets of those points and using those points and triplets as a unique identification for each rough/cut/polished diamond and for definitively establishing the lineage (parent-child relationship) between a specific rough stone and the finished stones cut from that specific rough stone.

- Mr. Ravindran asked Dr. Rady to send him a copy of his patent application by email (which, at the time, had yet to be published), reiterating the earlier promises made by Mr. Duranton that his invention would be kept confidential and not used without Dr. Rady's permission. Exhibit 8.

---

[8] See Exhibit 6.

[9]    https://www.proactiveinvestors.co.uk/companies/news/190117/de-beers-pilots-blockchain-scheme-to-track-provenance-of-diamonds-190117.html

- Knowing that BCG was behind schedule and under the gun and did not have 3D scanners and spectral imaging cameras at hand, Dr. Rady also explained to Dr. Ravindran that for an inexpensive proof-of-concept, a rudimentary 3D model of a rough stone could be generated using multiple images from multiple angles. Dr. Rady explained that the resulting 3D model could then be used to generate a set of enhanced 2D silhouettes from which a data set of geometric shapes could be extracted, representing boundary contours of the diamond. Dr. Rady explained that the obtained data set could then be compared to a reference data set to confirm whether the reference data was from the same stone using any one of several shape similarity methods to compute similarity between the two sets of data. Dr. Rady explained to Mr. Ravindran that all of the details for accomplishing this rudimentary proof of concept was set forth in a 2008 paper entitled "Shape Complexity from Image Similarity," which Dr. Rady gave to Mr. Ravindran via email. While the Shape Complexity paper starts the process by making a first set of Silhouettes, Dr. Rady explained that this step was unnecessary if a 3D scanner was available for generating the 3D model. Dr. Rady explained to Mr. Ravindran, however, that this rudimentary proof of concept would only work for re-identification of rough stones and could not be used to identify whether a finished stone was cut from a particular rough stone.

- Mr. Ravindran asked what kind of arrangement Dr. Rady would like in exchange for BCG using his inventions for Project Midnight. Dr. Rady reiterated what he told Mr. Duranton saying that he would be interested in

- 22 -

a licensing relationship to help BCG advance the De Beers project.

61. On January 18, 2018, in reliance on Mr. Ravindran's assurances that BCG would maintain the confidentiality of Dr. Rady's patent application and not use any aspect of it without his permission, Dr. Rady provided a copy of his patent application to Mr. Ravindran. Exhibit 8. In complete betrayal of his assurances to Dr. Rady, Mr. Ravindran immediately circulated Dr. Rady's unpublished patent application throughout BCG via email to promote Dr. Rady's invention as a solution to BCG's client projects relating to traceability, provenance, asset tracking, anti-counterfeiting, supply chain management and simulation. See ¶77, below.

62. Following BCG's receipt of Dr. Rady's patent application, BCG and De Beers obtained 3D scan data from Sarine Technologies ("Sarine")[10] for a handful of diamonds, scanned those diamonds using spectral imagers at a London university, used the 3D scan data and spectral data to identify points in 3D coordinate space that correspond to inclusions, occlusions, and other physical features of each diamond, and to determine a series of triplets of those points to generate a unique identification of each rough/cut/polished diamond which could be used to establish the lineage (parent-child relationship) between a specific rough stone and the finished stones cut from that specific rough stone, constituting the first instance of what became known as Stone ID, verifying the operability of Dr. Rady's invention.

63. In March 2018, BCG created "The Fifty Five Foundry, Inc." ("55 Foundry")[11] to exploit Dr. Rady's invention, later branded as Tracr (the name given by BCG and De Beers to Dr. Rady's invention) to expand the use of Dr. Rady's technology to different asset classes in addition to diamonds. Mike Schwartz, a BCG Partner, a key member of Project Midnight, and newly tapped

---

[10] Sarine develops equipment for planning, processing, and grading of diamonds, to determine how to best plan and cut a rough diamond into one or more cut and polished stones.

[11] https://www.youtube.com/watch?v=lcLTP2DDTvA

to head 55 Foundry together with BCG Partner Jeff Schumacher[12], characterized Tracr (Dr. Rady's invention) as a "pan-industry" solution for asset identification, authentication, tracking, provenance, tokenization and fractionalization. Within 55 Foundry, the effort to exploit Dr. Rady's invention was named the "Origyn Project." In July 2020, BCG established Origyn Research USA, LLC to use Dr. Rady's invention for the development of a device specifically for authenticating second-hand luxury goods, collectibles, artwork, and other assets. In August 2020, BCG established Origyn Foundation to promote Dr. Rady's invention for the authentication of second-hand luxury goods, collectables, artwork, and other assets. In October 2020, in a video presentation by Mike Schwartz, Schwartz confirms that Origyn is using the Tracr technology for the authentication of second-hand luxury goods, collectibles, artwork, and other assets. [13] In November 2022, 55 Foundry changed its name to NAX Group, NAX standing for "New Asset Exchange." [14] In July 2023 and November 2024, Mike Schwartz formed the Pan Industrial Companies as additional vehicles to commercialize Dr. Rady's invention.[15]

64.     In short, after BCG and De Beers had completed Project Midnight and launched Tracr using Dr. Rady's invention, BCG began leveraging Dr. Rady's invention across a host of industries, forming entity after entity. Indeed, many of the BCG personnel that worked on Project Midnight also became associated with the BCG ventures 55 Foundry, Origyn, Pan Industrial, and NAX Group, including Mike Schwartz, Deepak Gopalakrishna, Henning Diedrich, Rick Porter, David Phan, Farshad Kheiri, Tianyi Li, Austin Fatheree, Peter Borah, and Kevin Seagraves.

65.     In the meantime, in March 2018, Dr. Rady spoke with a representative of Rio Tinto, Plc ("Rio Tinto"), one of the largest metal and mining corporations in the world, about potentially

---

[12] At the time, Chief Executive Officer and Founder of BCG Digital Ventures where Project Midnight originated.
[13] https://www.youtube.com/watch?v=2r5qQBKAHHU
[14] NAX Group was led by Jeff Schumacher.
[15] https://www.youtube.com/watch?v=XZDmLJlJHCw

licensing his invention. Dr. Rady informed Ms. Gallego of this potential licensing opportunity, who then introduced Dr. Rady to Sophie Pradere ("Ms. Pradere"), Senior Legal Counsel with BCG. Ms. Pradere strongly suggested that Dr. Rady not pursue discussions with Rio Tinto as it might interfere with BCG's relationship with De Beers and the ongoing discussions regarding the use of Dr. Rady's invention for Project Midnight. Based on Ms. Pradere's direction, Dr. Rady did not pursue discussions with Rio Tinto.

66.     On May 10, 2018, De Beers announced the launching of Tracr. In that announcement, De Beers proclaimed that "**[a]s the diamonds travel along the value chain, a unique Global Diamond ID is automatically created on Tracr…** This allows Tracr to consolidate the data into an immutable digital trail for each physical diamond**, assuring its provenance and traceability from rough to polished.**" De Beers' then-CEO, Bruce Cleaver, added **"[t]he Tracr project team has demonstrated that it can successfully track a diamond through the value chain, providing asset-traceability assurance in a way that was not possible before**." Exhibit 9.

67.     The "Tracr project team" referred to in the De Beers announcement was in fact the Project Midnight Team[16], while the "Global Diamond ID" and "Tracr" are Dr. Rady's invention, finally solving the problem that De Beers and BCG had struggled with until misappropriating and using Dr. Rady's invention without his permission.

68.     On May 11, 2018, immediately upon learning of the De Beers announcement of Tracr, Dr. Rady confronted Mr. Ravindran, pointing out that Tracr was a direct misappropriation

---

[16] The BCG personnel staffed on Project Midnight included: Arun Ravindran, Roman De Laubier, Amine Benayad, Amine Bouamama, Mike Schwartz, Mark Zaleski, Mathias Tauber, Deepak Gopalakrishna, Henning Diedrich, Alison Rushworth, Jan Philipp Bender, Philip Hoerning, Xiao-Xiao J. Zhu, Raju Sarma, Junius Ho, Rick Porter, David Phan, Farshad Kheiri, Tianyi Li, Austin Fatheree, Peter Borah, Kevin Seagraves, and Sergey Sushentsev. On information and belief, the De Beers personnel that provided direct oversight on Project Midnight included Bruce Cleaver (currently Senior Advisor, BCG), Neil Ventura (currently Expert Advisor, BCG), Feriel Zerouki and David Prager.

of the invention he had disclosed to Messrs. Duranton and Ravindran on their repeated assurances that it would not be disclosed or used without his permission. Mr. Ravindran once again asked Dr. Rady whether he would be willing to license his invention to BCG, to which Dr. Rady once again stated that he would be interested in a licensing relationship. During this conversation, Mr. Ravindran revealed that BCG and De Beers were working on a patent application specific to Tracr. When Dr. Rady objected, Mr. Ravindran said "what if [BCG] just file[s] for identification and re-identification of diamonds in certain jurisdictions?" Dr. Rady made clear to Mr. Ravindran that he would consider this to be an illegal theft of his intellectual property.

69.    Between May 14, 2018, and May 24, 2018, Dr. Rady had several meetings and communications with Ms. Gallego, Messrs. Duranton, Ravindran, De Laubier, and Ms. Pradere in which:

- Dr. Rady continued to raise his concerns regarding the fact that Tracr had been taken directly from the invention he had disclosed to Messrs. Duranton and Ravindran in confidence.

- Dr. Rady raised his concerns about the dissemination of his invention throughout BCG and demanded that his concerns be resolved before any further dissemination or use of his invention, including at a BCG global meeting planned for June 2018 in which BCG intended to present Tracr.

- On May 14, 2018, in response to an email sent by Dr. Rady reiterating his concerns about the use of his invention without his permission in Tracr, Mr. Ravindran stated "**Gamma work on Tracr is limited to StoneID – to create rough/polished signatures to identify rough, polished and rough-to-polished. In other words, our work is on stone geometry, 3D**

modeling and spectroscopy….**we need to formalize how to use your patent pending work for Tracr**." Exhibit 10.

- Ms. Gallego also sent an email to BCG legal [Ms. Pradere], saying **"as you know, Max [Dr. Rady] has a provisional patent under his own name…The application of his work can help us in a lot of client cases, Max [Dr. Rady] does not want to give up all the rights of his work to BCG and wants to retain ownership…We could do something where BCG would have full exclusivity of that license against competitors."** Exhibit 11.

- Mr. Ravindran repeatedly asked Dr. Rady if he would be interested in licensing his invention for Tracr. Dr. Rady repeatedly replied that he would indeed be interested in licensing his invention for Tracr so long as he was properly compensated.

- Mr. Duranton, in an attempt to appease Dr. Rady, offered to set up a BCG standalone business unit for asset provenance and tracking to be funded by B-Capital (the funding arm for BCG) and install Dr. Rady as its global head.

- Ms. Gallego informed Dr. Rady that his concerns regarding the unauthorized use of his invention in Tracr were a top priority at the highest levels of BCG and that BCG was exploring the possibility of licensing Dr. Rady's patent. Exhibit 12.

- Ms. Gallego informed Dr. Rady that BCG legal counsel had conducted an investigation and confirmed that Dr. Rady had no connection with, or

- 27 -

exposure to, Project Midnight, confirming that Dr. Rady's invention had not been developed in the course of his employment with BCG. Exhibit 13.

70.     Meanwhile, on May 22, 2018, Shervin Khodabandeh ("Mr. Khodabandeh"), a Managing Director and Senior Partner at BCG Gamma sent an email to BCG Gamma's global distribution list (approx. 600 employees globally), attaching a slide (Exhibit 14) shown at the BCG Gamma World-Wide meeting in Paris describing the Tracr platform solution in detail. This slide shows how Tracr uses 3D ("shape") data and spectral analysis to map anomalies, sets of triplets and the relative distances of the inclusions to produce a gemstone's unique "fingerprint" or "Stone ID" allowing for rough-to-rough, polished; and rough-to-polished matching – identical in all material respects to Dr. Rady's invention which he disclosed to BCG, and which was the subject of his then-pending patent application.

71.     On June 1, 2018, at the JCK Conference in Las Vegas, De Beers hosted a panel discussion on the benefits of Tracr. Alrosa, De Beers, BCG, Venus Jewel, Signet and Sarine all participated in the panel discussion.[17]  Not coincidentally, shortly after being exposed to Dr. Rady's invention by De Beers and BCG (See ¶ 62, above), Sarine went on to promote and sell a diamond traceability solution, called Sarine Diamond Journey Traceability.

72.     On June 29, 2018, in an interview, Deepak Gopalakrishna ("Mr. Gopalakrishna"), Principal and Director of Product Management at BCG DV, a key member of Project Midnight, and simultaneously holding the position of General Manager of Tracr, described the novelty and inventiveness of the Tracr solution which he says solves all of the problems required for diamond identification, tracking and provenance:

> **"to track a diamond throughout the value chain, you need to solve three distinct problems: You must determine the characteristics that uniquely identify a piece of**

---

[17] https://www.linkedin.com/feed/update/urn:li:activity:6409414819958575104/

**rough; you must do the same for a piece of polished; and the most challenging, you must be able to match the piece of polished with the rough it comes from. All three problems have different solutions that utilize different characteristics…We have working solutions to all three."**[18]

The "working solutions" to which Mr. Gopalakrishna was referring was Dr. Rady's invention which BCG and De Beers turned into Tracr.

*BCG pressures Dr. Rady to relinquish his claims against BCG and De Beers*

73.     Immediately after Dr. Rady raised his concerns in May 2018 about the misappropriation of his  intellectual property and its use without his permission in the Tracr solution, BCG legal relentlessly questioned Dr. Rady on how he came up with his invention, the scope of his studies and whether he had any exposure to project Midnight, claiming that the purpose of their inquiries is to determine how to include a commercial patent deal for Dr. Rady into the De Beers arrangement. Exhibit 15.

74.     On June 29, 2018, BCG summoned Dr. Rady to a meeting in London under the guise of resolving his dispute regarding the misappropriation of his intellectual property and its use without his permission in the Tracr solution. In this meeting, attended by Messrs. Duranton and Ravindran (attending by video), BCG internal counsel Ms. Pradere, and BCG external counsel from the law firm Fieldfisher, BCG's lawyers tried to intimidate Dr. Rady into giving up his claims of unauthorized use of his invention, asserting that his invention was not patentable (notwithstanding that BCG and De Beers were already preparing a patent application claiming Dr. Rady's invention as theirs), and that he should lower his sights and expectations. Not able to convince Dr. Rady to drop his contentions, Mr. Duranton suggested that Dr. Rady make a presentation regarding his invention to the head of BCG Innovation in Atlanta for the purpose of

---

[18]https://www.jckonline.com/editorial-article/tracr-de-beers-blockchain-platform/?utm_source=JCK+News+Daily&utm_campaign=c2af7dc9d3-EMAIL_CAMPA%E2%80%A6

evaluating the possible licensing and further exploitation of Dr. Rady's invention by BCG on behalf of itself and its clients.

75.    On July 19, 2018, Ms. Pradere sent by email to Dr. Rady an agreement on BCG letterhead titled "Agreement BCG INNOVATION _ Max Rady - 19 July 2018" and requested that he sign this agreement as a prerequisite to a meeting with the entire BCG Innovation team. The proposed agreement required Dr. Rady to: (i) falsely agree that BCG had maintained the confidentiality of his then unpublished Provisional Patent Application No 62/609,783; (ii) waive his legal rights to initiate legal action against BCG and De Beers for using his invention without his permission and (iii) prevent him from disclosing his invention to third parties, effectively giving BCG exclusive rights to his invention and depriving him of the ability to practice and commercialize his invention. Exhibits 16 & 17. Dr. Rady refused to sign the agreement.

76.    On August 15, 2018, Dr. Rady met Ms. Gallego in BCG offices in Boston, MA, for Dr. Rady's performance review meeting. BCG inhouse counsel Ms. Pradere was surreptitiously listening to the conversation through Ms. Gallego's computer. During the meeting, Ms. Gallego told Dr. Rady that his dispute with BCG regarding the unauthorized use of his invention was negatively impacting his reputation inside BCG and hindering his opportunities to work on some new and highly important projects. Ms. Gallego also confirmed that BCG and De Beers would be filing a patent application for identification of diamonds despite the concerns raised by Dr. Rady regarding the unauthorized use of his invention in Tracr. Dr. Rady reiterated to Ms. Gallego what he told Mr. Ravindran in May 2018, that BCG and De Beers filing a patent application claiming his invention as theirs would be considered illegal theft of his intellectual property.

77.    On August 16, 2018, while Dr. Rady was in BCG offices in Boston, MA., Ms. Gallego told Dr. Rady on BCG's internal SLACK messaging platform that "**Sesh [Mr. Iyer] just got sent some stuff that may make his head explode,**" Exhibit 18, and requested that Dr. Rady

meet her on the eleventh floor of BCG offices so she can share with him offline what Mr. Iyer received. Ms. Gallego shared with Dr. Rady an email chain with numerous email attachments showing, among other things, 1) that a second internal BCG investigation confirmed that there was "significant overlap" between Tracr and Dr. Rady's invention, 2) that Dr. Rady was not exposed to the De Beers' Project Midnight, with one email in the chain stating, "doesn't seem he [Dr. Rady] touched the codebase either;" and 3) that (contrary to the provisions of the draft agreement that BCG's lawyers presented to Dr. Rady on July 19, 2019) Mr. Ravindran had shared Dr. Rady's unpublished patent application globally with BCG employees to advance Project Midnight and other BCG corporate clients' projects immediately after receiving it from Dr. Rady. Ms. Gallego told Dr. Rady that following this internal investigation, Darren Braham ("Mr. Braham"), Legal Counsel BCG, recommended terminating Dr. Rady because, according to Mr. Braham, if Dr Rady were to discover the magnitude of BCG's unauthorized use of his IP/invention in numerous BCG's corporate clients' projects and ventures, he could sue and "**obliterate**" BCG.

78.     During the month of September 2018, Ms. Gallego continued to pressure Dr. Rady to release his claims against BCG,  saying that his claims against BCG were threatening his continued employment, revealing nevertheless a) that BCG's lawyers had concluded that Max's claims were legitimate, b) that the intellectual property belonged to Dr. Rady, c) that BCG was not going to take a license from Dr. Rady, d) that no one at BCG was going to admit culpability, and e) that BCG and De Beers were preparing a competing patent application. These conversations included the following communication on BCG's internal SLACK messaging platform:

> "**I want to talk to you about this legal stuff, it needs to end**
>
> **so I just need to know what you need to be happy and meet BCG in the**
>
> **middle**

**I don't see an end in sight and it's not getting better**

**so maybe take the weekend to see what it is you want here as an employee**

**vs all the legal crap**

**. . .**

**the IP license isn't gonna happen**

**. . .**

**no one is going to get fired or admit to any breach**

**. . .**

**I told Sophie [Ms. Pradere] I would just let you file your patent, part ways**

**with this IP stuff and when your patent is filed, let the cards land where they**

**may**

**she [Ms. Pradere] said that they [BCG lawyers] admit it's totally your IP**

**not part of BCG**

**. . .**

**BCG lawyers see no breach there is no patent yet or proof of infringement**

**Just to be clear so I don't confuse Sophie's words**

**And she has said there is no poof to say otherwise**

**And our external counsel has said the same**

**And no overlap with the other patent**"

Exhibit 19.

79.     Ms. Gallego's reference to "**the other patent**" was to the patent application that BCG and De Beers were drafting that claimed Dr. Rady's invention with a focus on re-identification of rough gemstones.

80.     On September 26, 2018, Dr. Rady, through counsel, sent a cease and desist letter to BCG requesting BCG and its various business units to immediately cease any and all further disclosure and exploitation of the invention developed by Dr. Rady, including through De Beers and any other client or third party with whom Dr. Rady's invention was shared or used in breach of BCG's obligation of confidentiality.

81.     On October 4, 2018, Dr. Rady received exemplary comments for his annual review. In particular, Ms. Gallego stated that "one [Dr. Rady] of the brightest engineers I've ever worked with…he built the first version of our [BCG] software [Source] by himself….the combination of [Dr. Rady's] work ethic and intelligence is inspiring; … [he provides] outstanding contribution, consistently exceeds expectations; … [and] exemplifies BCG's core values….".

82.     On October 31, 2018, notwithstanding an exemplary review a few weeks earlier, BCG terminated Dr. Rady's employment. Dr. Rady's employment was terminated because of the concerns he raised regarding BCG and De Beers' misappropriation of his invention and his refusal to give up his claims of unauthorized use of his invention by BCG and De Beers.

83.     On July 4, 2019, a BCG presentation identified Tracr as a portfolio asset of BCG.[19]

84.     On November 5, 2019, Dr. Rady's first U.S. patent was granted, U.S. Patent No. 10,469,250 (the '250 patent). Exhibit 20. Dr. Rady immediately filed a first continuation patent application to pursue additional claims for his invention. Later, Dr. Rady filed second, third, fourth, fifth, sixth and seventh continuation patent applications, six of which have matured into a U.S.

---

[19] https://www.youtube.com/watch?v=u5VJFHzCuvY

Patent, and one of which is still pending. Four of Dr. Rady's continuation patents, U.S. Patent 12,375,261, U.S. Patent 12,401,496, U.S. Patent 12,580,734 and U.S. Patent 12,683,762, are the subject of this lawsuit. Exhibits 1, 2, 3 and 4. Dr. Rady has also obtained patents in numerous other countries and regions, including Canada, Japan, China, Belgium, Switzerland, Germany, France, United Kingdom, Italy, Monaco, Netherlands, Turkey, Russia, Australia, South Africa and the African Regional Intellectual Property Organization (ARIPO).[20]

*A Project Midnight Team Member Contacts Dr. Rady to Confirm BCG's and De Beers' Patent Infringement and Misappropriation of Dr. Rady's Invention*

85.    In mid-November 2019, Dr. Rady posted on his LinkedIn account that on November 5, 2019, the United States Patent and Trademark Office (the "USPTO") issued his first patent.

86.    On December 30, 2019, Dr. Rady received on LinkedIn a message from an anonymous individual claiming to be a developer at BCG DV and a collaborator on the Project Midnight team, indicating that he/she, as well as others on Project Midnight believed that critical information provided to them during development of Tracr had been misappropriated from Dr. Rady's then unpublished patent application and stated that he/she filed a complaint on the Anglo American speak-up hotline (https://www.speak-up-site.com/) on November 25, 2018. Specifically, this individual stated in his/her message:

> Hi, Max.
>
> Congratulations on your patent. Most of us at the office in London saw your LinkedIn post and we are happy for you but are unable to comment on it for job

---

[20] ARIPO member states include Botswana, Gambia, Ghana, Kenya, Liberia, Malawi, Zimbabwe, Sierra Leone, Mauritius, Mozambique, Namibia, Tanzania, Uganda, Zambia, Rwanda, Seychelles, Somalia, Sudan, Kingdom of Lesotho, Cabo Verde, Kingdom of Eswatini and Sào Tomé and Príncipe.

security and this is why this profile is not my real name. The post confirmed what most of us suspected last year when you left BCG that your patent was used in Midnight. I was one of the collaborators on Midnight and I and others sensed something odd last year after you left and were uncomfortable because management told us to keep quiet and carry on. I complained online anonymously to the Anglo-American speak up hotline (https://www.speak-up-site.com/) on 25 November 2018 because I wanted De Beers to know that BCG nicked your patent. The complaint reference is – 20181125065607. I reported in the hotline how Midnight was behind and in the beginning of 2018 the project team received technical information from Deepak regarding ideas for stone identification and tracking and through the use of this information we achieved several project milestones. We found out later that you disputed with BCG about the use of your patent without your permission and were terminated. There are rumors that you made a claim against BCG so I wish you good luck.

Exhibit 21.

87.     This individual also provided Dr. Rady with a screen shot of the confirmation number for the complaint on the speak-up hotline of Anglo American:

**Submit-A-Report-Success**

Thank you. Your report was submitted successfully!
Your reference number is: 20181125065607

Please remember your reference number in order to track its status using the "Receive Feedback" page on this website.

Return home

Exhibit 22.

88.     On March 13, 2020, Dr. Rady filed his first patent infringement lawsuit against De Beers and BCG in the Southern District of New York. De Beers and BCG moved to dismiss Dr.

Rady's complaint asserting that claim 1 of the '250 patent was invalid under 35 U.S.C 101 for being directed to "an abstract idea." The court held in favor of De Beers and BCG. Dr. Rady appealed the district court's decision to the U.S. Court of Appeals for the Federal Circuit where the district court's decision was affirmed on March 27, 2024.

89.    In the meantime, as noted above, Dr. Rady had filed several continuation patent applications. Following the March 27, 2024, Federal Circuit decision, Dr. Rady amended the claims of his still pending patent applications to define his invention in a way that would not reasonably be characterized as an abstract idea. Four of those continuation patents, U.S. Patent 12,375,261 ("the '261 patent"), U.S. Patent 12,401,496 ("the '496 patent"), U.S. Patent 12,580,734 ("the '734 patent"), and U.S. Patent 12,683,762 ("the '762 patent"), are the subject of this Complaint. Exhibits 1, 2, 3 and 4.

90.    As stated above, shortly after learning that Dr. Rady's invention solved the diamond traceability problem, BCG began working with De Beers to draft a patent application disclosing and claiming subject matter invented by Dr. Rady and disclosed by Dr. Rady to Mr. Ravindran in January 2018.

91.    On information and belief, De Beers gave to an individual named "Qi He Hong" Dr. Rady's patent application, the application that De Beers and BCG had drafted together in early 2018, and the Shape Complexity paper that Dr. Rady had given to Mr. Ravindran, and asked Qi He Hong to work up one or more patent applications and patent claims that could be used to cover all or parts of the Tracr solution, effectively asking Qi He Hong to write one or more patent applications and claims for Dr. Rady's invention. On information and belief, Qi He Hong complied with this request and ultimately prepared four patent applications entitled, respectively, "Re-identification of Rough Gemstones," "Gemstone Planning," "3D Modeling of Rough Gemstones," and "Measurement of Rough Gemstones." Together, these patent applications disclose little more

than what Dr. Rady had disclosed to BCG in early 2018. With these four patent applications, taken directly from Dr. Rady's disclosures to BCG, De Beers was illegitimately and surreptitiously attempting to secure a patent monopoly on Dr. Rady's invention and Tracr.

92.    All four of the applications drafted by or on behalf of Qi He Hong were filed in the UK patent office in June 2019. Roughly one year later, three of them were filed as PCT (Patent Cooperation Treaty) applications in the European Patent Office in May 2020, and two of them ("Re-identification of Rough Gemstones" and "Gemstone Planning") were eventually filed in the U.S. in December 2021. Both of the applications filed in the U.S. were granted. A continuation application from the "Re-identification of Rough Gemstones" patent was filed, and a third patent was granted. The two De Beers patents entitled "Re-Identification of Rough Gemstones," U.S. Patent No. 11,893,809 and U.S. Patent No. 12,354,384, Exhibits 23 and 24, respectively, are the subject of the correction of inventorship claims asserted herein.[21]

93.    Specifically, on June 20, 2019, De Beers UK Limited filed a patent application entitled "Re-Identification of Rough Gemstones" in the UK patent office, incorrectly/falsely naming Qi He Hong as the sole inventor and failing to correctly name Dr. Rady as the true inventor of the claimed invention.

94.    Qi He Hong did not conceive or contribute to the conception of the invention described and claimed in the De Beers patent application. Rather, he wrote the "Re-Identification of Rough Gemstones" patent application based on information he received from De Beers, which De Beers received from BCG, and which BCG received from Dr. Rady, adding nothing of his own conception.

---

[21] Dr. Rady does not claim to have invented the subject matter claimed in the De Beers "Gemstone Planning" U.S. Patent No. 12,117,403 because, while the hardware that is disclosed and claimed is identical to Dr. Rady's invention, Dr Rady does not claim to have conceived of the use of his invention for "Gemstone Planning," i.e., determining how best to cut a rough diamond into one or more cut and polished stones.

95.     On December 17, 2021, while Dr. Rady was litigating his claims of the misappropriation of his invention by BCG and De Beers, De Beers UK Limited filed the "Re-Identification of Rough Gemstones" patent application in the U.S., as serial number 17/620,477, also incorrectly/falsely naming Qi He Hong as inventor and failing to correctly name Dr. Rady as the true inventor of the subject matter claimed. U.S. Patent Application serial number 17/620,477 issued into U.S. Patent No. 11,893,809 (the '809 patent), on February 26, 2024, incorrectly/falsely naming Qi He Hong as the sole inventor and failing to correctly name Dr. Rady as true inventor of the subject matter claimed.

96.     On January 4, 2024, just before the '809 patent was to issue, De Beers UK filed a continuation patent application in the U.S., as serial number 18/404,570, again incorrectly/falsely naming Qi He Hong as inventor and failing to correctly name Dr. Rady as the true inventor of the subject matter claimed. U.S. Patent Application serial number 18/404,570 issued into U.S. Patent No. 12,354,384 (the '384 patent) on July 8, 2025, incorrectly/falsely naming Qi He Hong as the sole inventor and failing to correctly name Dr. Rady as true inventor of the subject matter claimed.

97.     All of the elements of the claims of the '809 and '384 patents were first conceived by Dr. Rady and disclosed by him to Mr. Ravindran. See Exhibit 25 and Exhibit 26 matching the claims of the '809 and '384 patents, respectively, to Dr. Rady's disclosures of his invention and an inexpensive proof-of-concept to Mr. Ravindran. Mr. Ravindran and BCG disclosed Dr. Rady's invention to De Beers, and De Beers asked Qi He Hong to prepare one or more patent applications directed to Dr. Rady's invention.

98.     The '809 and '384 patents claim certain elements of Tracr. The '809 and '384 patents were filed more than one year after the commercial release of Tracr. Although De Beers was well aware of Dr. Rady's patent application and of Tracr, De Beers did not disclose Tracr or Dr. Rady's patent application to the USPTO.

99.     In May 2019, De Beers launched "Tracr Community" portal as an educational resource and collaboration space for all Tracr related topics, technology education, and onboarding material. On May 21, 2019, in an online Tracr Community Briefing presentation, Mr. Duffy and Michillay Brown, Industry Transformation Lead of De Beers', demonstrated how Tracr registers diamonds and the use of virtual orientation for the purpose of matching and verification of the stones. See, [Rady v. BCG, et al. Complaint Video Folder Hyperlink](), May 21, 2019 Tracr Community Briefing video @14:25.

100.    Meanwhile, on February 27, 2020, Forbes included De Beers on its annual Forbes Blockchain 50 recognizing enterprises embracing blockchain technology. "To qualify, Blockchain 50 members must be generating at least $1 Billion in revenue annually or be valued at $1 Billion or more." In particular, Forbes indicated that Tracr "follows diamonds, which have undergone 3-D scans, as the gems are mined, cut, polished and sold. Already more than 30 participants, including Signet Jewelers – owner of Kay, Zales, Jared and Blue Nile – have signed on. Tens of thousands of stones are being registered per month."[22]

101.    On April 30, 2020, Jim Duffy ("Mr. Duffy"), head of De Beers' Tracr platform, compared the Tracr solution to the industrial revolution in terms of connecting the digital and physical worlds to create connected value chains.[23]

102.    On June 17, 2020, in an online Tracr Community Briefing presentation, Mr. Duffy and Michillay Brown, Industry Transformation Lead of De Beers', said that De Beers was exploring the use of Tracr beyond the diamond industry and that it was working closely with its parent Anglo American to use a version 2-3 of Tracr for platinum, iron ore and nickel traceability.

---

[22] https://www.forbes.com/sites/michaeldelcastillo/2020/02/19/blockchain-50/
[23] https://www.youtube.com/watch?v=erO-de7hQ3I

See, Rady v. BCG, et al. Complaint Video Folder Hyperlink , June 17, 2020 Tracr Community Briefing video @44:00.

103.    On July 6, 2020, Mr. Duffy and Michillay Brown, reiterated the use of Tracr beyond the diamond industry and said that it is equally important to prove to the customer that the entire diamond ring (the diamond and the metal it is mounted on) is ethically sourced and since Anglo American is the world's largest producer of platinum, a version of Tracr (which later became known as "Valutrax") would be used to track platinum which would be hosted on a different blockchain ledger and the customer would receive two IDs, one for the diamond and one for the platinum, verifying the provenance and ethical sourcing of the diamond and the metal.[24]

104.    On October 15, 2020, PricewaterhouseCoopers (PwC) listed Tracr, "used by De Beers Group to verify the authenticity and origin of diamonds," as one of the top use cases for blockchain for provenance. In its report, PwC expected the "implementation of provenance systems such as Tracr to account for a $962B USD boost to global GDP by 2030."[25]

105.    In a study published by De Beers in its 2021 Diamond Inside Report, 85% of consumers surveyed indicated that they would be willing to pay an average premium of 15% for a tracked diamond that is guaranteed to be both legitimate and ethically sourced.[26]

106.    In August 2020, BCG established Origyn Foundation to promote Dr. Rady's invention for the authentication of second-hand luxury goods, collectables, artwork, and other assets. [27] In March 2022, Origyn Foundation promoted itself as having a team that is distributed across the globe, and advertised itself as built for customers of top brands and fashion houses as

---

[24] https://www.youtube.com/watch?v=fbWC5o3mpw4
[25] https://www.securities.io/pwc-forecasts-major-blockchain-adoption-identifies-top-use-cases/
[26] https://www.debeersgroup.com/~/media/Files/D/De-Beers-Group-V2/documents/reports/insights/2021/2021-the-diamond-insight-report.pdf
[27] https://www.youtube.com/watch?v=2r5qQBKAHHU

- 40 -

well as leading resellers, bringing guaranteed authenticity to original and pre-owned luxury items, enabling customers to authenticate and trace lifetime ownership of valuable objects.[28] In an April 2022 interview, Chairman and co-founder of Origyn Foundation, Mike Schwartz described Origyn Foundation as having a global footprint, stating that he works with a group of people spread around the world in every continent except for Antarctica to identify and authenticate objects using robots and desktop machines.[29]  Mike Schwartz said that Origyn has a minting engine and that Origyn is minting digital twins of many thousands of items with industry leaders in both primary and secondary markets. Id. Asked to discuss Origyn's authentication platform, Mike Schwartz repeatedly referred to Tracr as a pan industry solution that was built for the diamond industry, adding that Origyn is expanding the platform to different asset classes and industries, and that Origyn has identified industry leaders in key industry sectors that can bring market volume and inventory to Origyn's platform. Id. Mike Schwartz noted further that Origyn has signed major players in luxury goods with initial focus on luxury watches, and that since these conglomerates work across watches, handbags, jewelry and fashion, Origyn has been quickly introduced to other asset classes. Id.  In a June 2022 interview, Vincent Perriard, Co-Founder of Origyn Foundation, said that Origyn Foundation employs 74 people at its main location in Manhattan Beach, California, 25 employees in Switzerland, and 8 employees in an office in Ukraine.[30] In November 2022, Origyn Foundation attended the Re-Luxury Event in Geneva Switzerland, a trade show that focuses on the secondary (second-hand) luxury industry. At the event, Origyn Foundation

---

[28]https://assets-global.website-files.com/63da765ff48ebc20ed30d7b2/642c50339fb5252801cd7bc8_d0YjQxku5K5S7tbTGWa8hPjVuuxc3T9kqcO0Bp8T78I.pdf

[29] https://www.youtube.com/watch?v=Kwa7keyCkUA

[30]    https://www.heidi.news/explorations/dix-acteurs-majeurs-de-la-crypto-en-suisse-romande/des-nft-biometriques-pour-garantir-l-authenticite-des-objets-de-luxe

demonstrated use of the Origyn Minting Box and released a video entitled "For the first time in history, an object itself becomes its own proof of authenticity."[31]

107.    In July 2023 Mike Schwartz formed the first of several new companies sharing the name "Pan Industrial". In February 2024, Origyn Foundation announced that in response to increasing demand from many different industry sectors wishing to make use of the Origyn protocol, Origyn is introducing its Certified "Integrator" Model, anointing "**Pan Industrial**" as a Certified Origyn Integrator. In the announcement, Mike Schwartz, Co-Founder of both Origyn and Pan Industrial, is quoted as saying: "In order to effectively scale industry's use of the ORIGYN Protocol's services and fully realize its growth potential, it has become necessary to leverage ORIGYN-certified system integrators who possess the bandwidth and skills to service industry participants in their quest to leverage ORIGYN's Web 3.0-based Real World Asset ("RWA") infrastructure." Origyn's Web 3.0-based RWA infrastructure requires the use of an infringing scanning machine to authenticate real world objects. The announcement states that Pan Industrial is currently engaged with industry leaders in the Real Estate, Financing, Taxation, Sports, Financing, Carbon Offsets, and Gemstones industries. The announcement concludes with an invitation to contact Pan Industrial and Origyn via email: "Organizations wishing to explore leveraging the ORIGYN Protocol's industry leading RWA infrastructure can contact Pan Industrial via info@panindustrial.com. Other existing system integrators wishing to explore attaining certified ORIGYN Integrator status, and/or ORIGYN's bounty programs, should contact admin@origyn.ch."[32] In February 2024, Austin Fatheree, co-founder and co-owner of Pan Industrial and former CTO at Origyn Foundation, anticipating the #ETHDenver 2024 Conference,

---

[31]https://www.linkedin.com/feed/update/urn:li:activity:7006732331369598976/;                see                also:
https://www.youtube.com/watch?v=OCG4TRB521I; https://www.rts.ch/info/economie/13521536-le-seconde-main-de-luxe-un-secteur-en-expansion-qui-doit-traquer-les-contrefacons.html

[32]\https://origyn.medium.com/origyn-foundation-unveils-strategy-to-service-increasing-industry-demand-via-the-introduction-of-60b2498508da

posted on his Linked-In page: "A week away from #ETHDenver! I'm bringing all that we're doing with Pan Industrial with me. Pan Industrial is not only a certified integrator for the Origyn protocol, but we also provide broad web3 x AI advisory, build, and validation services. If you're going to be in Denver and you'd like to hear about the opportunities we are exploring, including the enterprise-focused web3 cross-chain network we're exploring based on the years of experience we have piloting web3 with enterprise, hit me up!" In April 2024, Origyn Foundation published an article entitled "The Most Advanced RWA Certification Protocol in the World." Describing the implementation of the Origyn Protocol, the article describes the role of the integrators: "the integrators play a crucial role in expanding the ORIGYN's reach and impact across various industries. These certified integrators leverage ORIGYN's technology in their own systems and solutions, bringing the benefits of asset certification to new markets and industries. By partnering with integrators, ORIGYN ensures the widespread adoption of its standards and protocols, further solidifying its position as a trusted guardian of asset integrity. We like to see "the Integrator" as the as bees pollinating flowers, the integrator facilitates interactions between different industries and enhances the ecosystem's functionality. By integrating new partners and leveraging their expertise, the integrator helps the ecosystem flourish and evolve."[33] In a May 2024 video, Mike Schwartz reiterates that Origyn is creating digital twins of real world assets ("RWA") and that Origyn set up the Integrator program to take the cost burden off of Origyn, adding that Pan Industrial is the first anointed integrator to go out and bring large industry players to plug them into the real world asset infrastructure of Origyn.[34] In a September 2024 Origyn publication, Origyn states that "since Origyn Foundation is not for profit, the integrators who are independent companies to be approved by the foundation for a financial commitment of $250,000 will act as

---

[33] https://origyn.medium.com/origyn-2024-c939b4c510ef
[34] https://www.youtube.com/watch?v=XZDmLJlJHCw

intermediaries between Origyn and the industry to drive the adoption of Origyn's protocol and that by outsourcing the enterprise-facing aspects of its operations to integrators, Origyn ensures that its technology can be scaled and adopted across industries while adhering to the principle of decentralization."[35] In January 2025, an Origyn publication describes the challenge of authenticating luxury goods and how the luxury market struggled with counterfeiting and how traditional methods of authentication are susceptible to forgery. According to the article, Origyn addresses these challenges by capturing the unique biometric data of each luxury item to create a digital twin of the physical asset and the digital twin is minted as an NFT on blockchain[36] ensuring an immutable record to verify the authenticity and provenance of the asset by accessing its digital certificate through Origyn's platform. This is precisely what is covered by Dr. Rady's patents. According to the article, Origyn has successfully applied its technology across various luxury markets: Luxury watches, Fine Art and Jewelry and Gemstones.[37]

108.    On April 30, 2021, Dr. Rady established Tachyon Impact Solutions S.A.R.L. ("Tachyon") for the purpose of commercializing his invention and launched its products and services to the diamond, luxury, FinTech/insurance (fractionalization and tokenization), and manufactured goods (aerospace, automotive, oil and gas, pharmaceutical) markets.

**Dr. Rady's U.S. Patent No. 12,375,261**

109.    Dr. Rady is the sole inventor and owner of the '261 patent.

110.    Dr. Rady's U.S. Patent No. 12,375,261 duly and legally issued on July 29, 2025.

---

[35] https://origyn.medium.com/the-integrator-program-671cdee87181
[36] Origyn uses Dfinity's blockchain.
[37]    https://origyn.medium.com/bridging-physical-and-digital-how-origyns-digital-certificates-authenticate-luxury-assets-39a51819f8c2

111. Dr. Rady exclusively owns all rights, title, and interest in the '261 patent, including the right to bring this action to recover past and future damages for Defendants infringement of the '261 patent.

112. Defendants are not and have never been licensed to practice Dr. Rady's '261 patent.

113. The '261 patent is valid and enforceable.

114. Claim 1 of the '261 patent recites:

An apparatus comprising:

a housing,

a spectral imaging camera mounted in or on said housing,

a light source mounted in or on said housing,

a laser range scanner mounted in or on said housing,

a power source,

a processor in electronic communication with, said spectral imaging camera, and said laser range scanner,

a non-transient computer-readable memory in digital communication with said processor,

said non-transient computer-readable memory containing a plurality of

unique digital signatures for a plurality of pre-recorded specific physical items, each of said unique digital signatures comprising a digital combination of spectral data and 3D scan data of one of said pre-recorded specific physical items identifying and mapping in 3D coordinate space physical features of said one of said pre-recorded specific physical items,

wherein said physical features comprise one or more of anomalies, defects, imperfections, flaws, geometric irregularities, inclusions, occlusions, scratches, tears, and warps.

**Dr. Rady's U.S. Patent No. 12,401,496**

115. Dr. Rady is the sole inventor and owner of the '496 patent.

116. Dr. Rady's U.S. Patent No. 12,401,496 duly and legally issued on August 26, 2025

117. Dr. Rady exclusively owns all rights, title, and interest in the '496 patent, including the right to bring this action and to recover past and future damages for Defendants' infringement of the '496 patent.

118. Defendants are not and have never been licensed to practice Dr. Rady's '496 patent.

119. The '496 patent is valid and enforceable.

120. Claim 1 of the '496 patent recites:

A system comprising

one or more processors,

a spectral imaging camera,

a laser range scanner,

a light source,

a non-transient computer-readable memory and

a connection to a computer network,

said non-transient computer-readable memory containing computer-readable instructions which when executed by said one or more processors cause said one or more processors to:

use spectral data for a physical item received from said spectral imaging camera and 3D scan data for said physical item received from said

- 46 -

laser range scanner to identify and map in 3D coordinate space physical features of said physical item, reflecting relative distances between said physical features of said physical item to generate a unique signature for said physical item,

and

record said unique signature for said physical item.

**Dr. Rady's U.S. Patent No. 12,580,734**

121.  Dr. Rady is the sole inventor and owner of the '734 patent.

122.  Dr. Rady's U.S. Patent No. 12,580,734 duly and legally issued on March 17, 2026

123.  Dr. Rady exclusively owns all rights, title, and interest in the '734 patent, including the right to bring this action and to recover past and future damages for Defendants' infringement of the '734 patent.

124.  Defendants are not and have never been licensed to practice Dr. Rady's '734 patent.

125.  The '734 patent is valid and enforceable.

126.  Claim 1 of the '734 patent recites:

A method for generating a unique digital signature for a physical item comprising:

imaging said physical item to produce 3D spatial information and spectral data,

using said 3D spatial information and said spectral data to generate a digital 3D spatial map of said physical item, mapping in 3D coordinate space physical features of said physical item,

using said digital 3D spatial map to generate a unique digital signature for said physical item,

comparing said unique digital signature to a plurality of previously recorded unique digital signatures corresponding to a plurality of previously imaged

- 47 -

physical items to determine whether said physical item is identical to, part of, or completely different from any of said previously imaged physical items,

wherein said comparing step includes rotating in virtual space said physical features of said physical item defined by said unique digital signature to identify a match with physical features defined by one of said plurality of previously recorded digital signatures,

and

recording said unique digital signature on a non-transient computer readable memory.

127.    Claim 21 of the '734 patent recites:

An apparatus comprising:

a housing,

a spectral imaging camera mounted in or on said housing,

a light source mounted in or on said housing,

a power source,

a processor in electronic communication with said spectral imaging camera,

a non-transient computer-readable memory in digital communication with said processor,

said non-transient computer-readable memory comprises computer readable instructions which when executed by said processor cause said processor to:

use spectral data of a first specimen and 3D spatial information of said first specimen to generate

a) a first specimen plurality of points (x, y, z) mapping in 3D coordinate space physical features of said first specimen, and

b) a plurality of triplets [(x, y, z), (x′, y′, z′), (x″, y″ z″)] of said first specimen

plurality of points in said 3D coordinate space,

and

assign a unique digital signature to said first specimen, said unique digital

signature comprising said first specimen said plurality of points and said

plurality of triplets,

wherein said physical features comprise one or more of anomalies, defects,

imperfections, flaws, geometric irregularities, inclusions, occlusions,

scratches, tears, and warps.

**Dr. Rady's U.S. Patent No. 12,683,762**

128.    Dr. Rady is the sole inventor and owner of the '762 patent.

129.    Dr. Rady's U.S. Patent No. 12,683,762 duly and legally issued on July 14, 2026.

130.    Dr. Rady exclusively owns all rights, title, and interest in the '762 patent, including the right to bring this action and to recover past and future damages for Defendant's infringement of the '762 patent.

131.    Defendant is not and has never been licensed to practice Dr. Rady's '762 patent.

132.    The '762 patent is valid and enforceable.

133.    Claim 7 of the '762 patent recites:

An apparatus comprising:

a housing,

a spectral imaging camera mounted in or on said housing,

a light source mounted in or on said housing,

a 3D scanner mounted in or on said housing,

a power source,

a communication system in electronic communication with at least one or more

devices of a peer-to-peer network,

a processor in electronic communication with said spectral imaging camera, and

said 3D scanner, said communication system,

a non-transient computer-readable memory in digital communication with said

processor,

said non-transient computer-readable memory containing a plurality of unique

digital signatures for a plurality of pre-recorded specific physical items, each

of said unique digital signatures comprising a plurality of points (x, y, z)

mapping in 3D coordinate space physical features of said one of said pre-

recorded specific physical items.

**Patent Eligibility Under 35 U.S.C. 101**

134.    The claims of the '261 patent are explicitly directed to patent eligible subject matter under 35 U.S.C. 101, namely, a machine, a tangible apparatus. The invention recited in the claims of the '261 patent is neither a law of nature, a natural phenomenon, nor an abstract idea.

135.    The invention of claim 1 of the '261 patent is a machine, a tangible apparatus with moving, operating parts, including a housing, a 3D laser scanner, a light source, a spectral imaging camera, a power source, computer processors, and a non-transient computer-readable memory, the memory including a database of unique digital signatures for a plurality of pre-recorded physical items, each digital signature including a digital combination of spectral data and 3D scan data identifying and mapping in 3D coordinate space the physical features of each pre-recorded physical items.

136. The claims of the '496 patent are directed to patent eligible subject matter under 35 U.S.C. 101, a machine. The invention recited in the claims of the '496 patent is neither a law of nature, a natural phenomenon, nor an abstract idea.

137. The invention of claim 1 of the '496 patent is a machine, a tangible apparatus with moving, operating parts, including a 3D laser scanner, a light source, a spectral imaging camera, a power source, computer processors, and a non-transient computer-readable memory, the memory including computer-readable instructions which when executed by said one or more processors cause said one or more processors to use spectral data from the spectral imaging camera and 3D scan data from the laser range scanner to identify and map in 3D coordinate space physical features of said physical item, reflecting relative distances between said physical features of said physical item to generate and record a unique signature for the physical item.

138. The claims of the '734 patent are directed to patent eligible subject matter under 35 U.S.C. 101, a process, and a machine, a tangible apparatus. The inventions recited in the claims of the '734 patent are neither a law of nature, a natural phenomenon, nor an abstract idea.

139. The invention of claim 1 of the '734 patent is a method for generating a unique digital signature for a physical item including the steps of imaging the physical item to produce 3D spatial and spectral data, using the spatial and spectral data to generate a digital 3D map of the physical item,  using the digital 3D map to generate a unique digital signature  for the physical item, comparing the unique digital signature to previously recorded unique digital signatures to determine whether scanned physical item is the same as, part of, or totally different from the previously recorded physical items by rotating the physical features of the physical item in virtual space to identify a match with the physical features of a previously recorded physical item.

140. The invention of claim 21 of the '734 patent is a machine, a tangible apparatus with moving, operating parts, including a housing, a spectral imaging camera, a light source, a power

source, a computer processor, and a non-transient computer-readable memory having computer readable instructions for using spectral data and 3D spatial data of a specimen to generate a plurality of points mapping in 3D coordinate space the physical features (anomalies, defects, imperfections, scratches, tears, etc.),  of the specimen and a plurality of triplets of those points, and assign to the specimen a unique digital signature to the specimen including the plurality of points and the plurality of triplets of points.

141.    The claims of the '762 patent are directed to patent eligible subject matter under 35 U.S.C. 101, a machine, a tangible apparatus. The invention recited in the claims of the '762 patent are neither a law of nature, a natural phenomenon, nor an abstract idea.

142.    The invention of claim 7 of the '762 patent is a machine, a tangible apparatus with moving, operating parts, including a housing, a spectral imaging camera, a light source, a 3D scanner, a power source, a communication system, computer processors, and a non-transient computer-readable memory, the memory including a database of unique digital signatures for a plurality of pre-recorded physical items, each digital signature including a plurality of points (x, y, z) mapping in 3D coordinate space physical features of said one of the pre-recorded specific physical items.

143.    Moreover, the inventions of the '261, '496, '734, and '762  patents are novel, unobvious, and *practical* solutions to a problem that has plagued the diamond and luxury goods industries for decades, namely, machines, apparatuses, systems, and methods that can *irrefutably* identify, authenticate and establish the authenticity and provenance of any physical article, including  luxury items such as gemstones, jewelry, watches, shoes, handbags, raw materials such as ores and metals, manufactured items, such as automobile parts, aerospace parts, containers and barrels, as well as pharmaceuticals, and even artwork such as paintings and sculptures.

144.    Prior attempts to identify, authenticate, track physical objects relied on RFIDs, NFCs, QR codes, barcodes, engravings, inscriptions, holograms, markers, etc., all of which are susceptible to fraud/forgery, duplication and/or swapping. In addition, none of these methods can be used to reliably determine whether a physical object (authentic or otherwise) has been modified (i.e., parts replaced, damaged, removed or otherwise changed). Furthermore, none of these techniques/methods can irrefutably distinguish identical mass- produced articles of the same make, model and color, etc., from one another. For example, these methods cannot uniquely identify one genuine pair of Nike sneakers from another genuine pair of Nike sneakers of the same make, model, color and size.

145.    The inventions claimed in the '261, '496, '734, and '762 patents solve, for the first time, all of the foregoing challenges and problems in the prior art. The inventions claimed in the '261, '496, '734, and '762 patents can irrefutably identify, authenticate and track real world physical objects in a way that is 100% invulnerable to deception due to fraud/forgery/counterfeiting.

146.    The inventions claimed in the '261, '496, '734, and '762 patents can irrefutably determine whether a physical object (authentic or otherwise) has been modified in any way (i.e., parts replaced, damaged, removed, or otherwise changed).

147.    The inventions claimed in the '261, '496, '734, and '762 patents can irrefutably distinguish identical mass- produced articles of the same make, model and color, etc., from one another based on their own inherent physical features without any other identifying mark or feature.

148.    For example, the inventions claimed in the '261, '496, '734, and '762 patents can determine that an authentic Rolex watch has been repaired with authentic Rolex parts, no matter how small/inconsequential the part.

149.   The invention of the '261, '496, '734, and '762 patents is so innovative, transformative, and non-conventional and solved a long-sought difficult technical problem of irrefutably guaranteeing the authenticity and provenance of physical items, that as soon as Dr. Rady disclosed his invention to BCG (under promise of confidentiality), BCG and De Beers used it to build De Beers' Tracr, and De Beers proclaimed Dr. Rady's invention (Tracr) as significant as the industrial revolution.

150.   The U.S. Patent Examiner who examined the '261, '496, '734, and '762 patents was informed of the district court and Federal Circuit findings that claim 1 of the '250 patent (a grandfather patent to the '261, '496, '734, and '762 patents, and Dr. Rady's original patent for his invention) was ineligible subject matter. Having been informed of the district court and Federal Circuit decisions, the Examiner nevertheless determined that the claims of the '261, '496, 734 and '762 patents *do* recite eligible subject matter.

151.   The claims of the '261, '496, '734 and '762 patents are materially different from claim 1 of the '250 patent that was previously found to be directed to an abstract idea. Unlike the '250 patent's claim 1, which recited only a method of comparing digital representations, the claims of the '261 patent expressly recite a physical apparatus having a housing, a spectral imaging camera, a laser range scanner, a power source, a processor and non-transient computer readable memory. The memory contains the unique digital signatures of pre-recorded physical items, which digital signatures constitute a combination of spectral and 3D scan data that identify and map in 3D coordinate space the physical features of the pre-recorded physical items. The claims of the '496 patent expressly recite a tangible system comprising specific hardware components— including a spectral imaging camera, a laser range scanner, a light source, processors, and non-transient computer-readable memory—that work together to identify and map physical features in 3D coordinate space reflecting relative distances between those features. The claims of the '734

patent recite, inter alia, a physical apparatus with a housing, a spectral imaging camera and light source, and require the generation of specific data structures—a plurality of points (x, y, z) and a plurality of triplets of those points—that map physical features in 3D coordinate space. The claims of the '762 patent recite a physical apparatus with a housing, a spectral imaging camera, light source, and 3D scanner, along with a communication system connected to a peer-to-peer network and memory pre-loaded with a plurality of unique digital signatures. These specific structural and functional limitations were not present in claim 1 of the '250 patent and render the claims of the '261, '496, '734 and '762 patents directed to patent-eligible machines rather than abstract ideas. Moreover, the inventions described in the '261, '496, 734 and '762 patents provided for the first time the technical solution to a problem that had never been solved before, how to irrefutably identify, authenticate and track real world physical objects even if they have undergone modification in a way that is 100% invulnerable to deception due to fraud/forgery/counterfeiting.

**De Beers Group's Infringement of Dr. Rady's Patents**

152.    The Tracr platform is BCG's and De Beers' branding of BCG's Project Midnight, which BCG was only able to accomplish using Dr. Rady's invention. The term Tracr is used by De Beers to collectively refer to the digital platform, hardware/machines used to generate the diamond data, fingerprints generated for the rough and cut/polished stones, and the distributed database or "blockchain" containing rough, cut and finished diamond data and their fingerprints. These diamond fingerprints are generated using specialized scanning machines (also sometimes referred to as scanning machines, sight boxes, robots, and RhoVol) located at diamond mines, at diamond manufacturers (where rough diamonds are cut and polished), at diamond wholesalers, and at diamond retail outlets. Specifically, rough stones are first scanned and fingerprinted by these scanning machines at the mine. At each stage of the diamond journey, each rough stone and each stone that is cut from the rough stone, is re-scanned, and its fingerprint compared to the fingerprints

in the Tracr database to determine whether it is the same as, part of, or completely different from, for example, a new stone. In this way, Tracr (and more specifically, the diamond scanning machines) can irrefutably establish a diamond's provenance and track a diamond's journey all the way "from mine to finger." Likewise, the diamond scanning machines of Tracr can irrefutably determine when a diamond has not been mined from a legitimate source.

153.    Wesley Tucker, head of De Beers' Tracr platform described the Tracr process as follows: **"when a stone is discovered it is taken to a scanner which maps millions of points to form a complete 3D silhouette, or virtual replica, of the physical stone. This image and other characteristics such as the size and weight are logged on the system, completing the digital twin**." In response to a question, regarding how to know if 20 small gems came from the same rough diamond, Mr. Tucker said: "**What Tracr does really effectively is marry the children stones to the parent stone and it keeps the parent-child relationship. We've developed algorithms which can take multiple scans along the value chain and verify them back to the original stone. Then we take the scan of the diamond through the cutting and planning process and we send those to the cloud and match it the whole way through the process**". Exhibit 27.

154.    An essential feature of Tracr are the diamond scanning machines that generate the unique signature or fingerprint for each and every scanned rough stone and cut/polished stone, based on the stone's unique and inherent physical features.

155.    These diamond scanning machines include 3D scanners and spectral imaging cameras that generate 3D scan and spectral data. See, Rady v. BCG, et al. Complaint Video Folder Hyperlink, Creation of a Digital Asset video. The diamond scanning machines have processors and software that use the 3D scan data and spectral data to identify and map the shape, inclusions, occlusions, and other physical features of the stone. The mapping of shape, inclusions, occlusions,

and other physical features of the stone constitute part of a stone's unique identifier, and it is these unique identifiers that are used by Tracr to determine whether one stone is the same as, part of, or different from another stone.

156.    In short, Tracr, including the diamond scanning machines, the generation of a unique signature, and the use of the unique signature to identify the provenance of a diamond and track it from mine to finger, is identical to Dr. Rady's invention. Indeed, Tracr *is* Dr. Rady's invention.

157.    In order for Tracr to correctly, reliably, and irrefutably trace a cut and polished diamond back to the rough mined stone from which it was cut, every diamond scanning machine must generate the fingerprint in the exact same way, using a 3D scanner and a spectral imaging camera to generate 3D scan data and spectral data, then using the 3D scan data and spectral data to produce a unique digital signature which identifies and maps the physical features of the diamond. If the fingerprints are not generated in exactly the same way by every diamond scanning machine, the comparison and matching processes by which the identity and progeny confirmation is done would not produce the accurate results claimed by De Beers for Tracr.

158.    Therefore, every diamond scanning machine used in connection with Tracr must have at least a 3D scanner and a spectral imaging camera, a processor, and a memory that contains computer-readable instructions (software) which uses the 3D scan data and the spectral data to generate the unique signature in the exact same way, identifying and mapping inclusions, occlusions, anomalies, and other physical features, of each diamond.

159.    Therefore, every entity that imports into the U.S., offers for sale in the U.S., and/or uses in the U.S., a diamond scanning machine that participates in the Tracr platform is infringing Dr. Rady's '261, '496, '734, and '762 patents or at least contributing to the infringement of those patents.

160.    Prior to the misappropriation of Dr. Rady's invention by BCG and De Beers to create the Tracr platform, De Beers' mines each had a so-called RhoVol machine that measured the density of stones excavated from the mine. In order to implement Tracr, De Beers modified the RhoVol design to include 3D scanners, spectral imaging cameras, and software to compute the unique signature for each rough stone based on data from the 3D scanners and spectral imaging cameras.

161.    Since the announcement of Tracr, De Beers has actively and aggressively promoted the Tracr platform which, as noted above, necessarily requires the use of infringing diamond scanning machines. Companies that have joined the Tracr platform and are using the infringing machines include miners/producers, manufacturers, processors, graders, grading and certification labs, dealers, retailers, technology providers and De Beers Sightholders[38], customers[39], and partners.

162.    On May 10, 2023, De Beers released its Building-Forever 2022 sustainability report[40] announcing that Tracr, its **groundbreaking, blockchain based traceability platform,** was deployed at scale. The report goes on to state that De Beers Group's "**industry-leading platform Tracr . . . allows participants to capture data on each stone's unique attributes and detailed evidence of origin, from source to Sightholder to Jewelery store**." According to the report, "**the success of Tracr over the past year has proven this is a key strategic innovation for De Beers Group, fueling its ambition to be a leader in diamond traceability and that by 2030, De Beers will record the majority (by value) of De Beers Group's annual production on Tracr.**"

---

[38] https://www.debeersgroup.com/sightholders
[39] https://gss.debeersgroup.com/customer-directory
[40] https://www.debeersgroup.com/~/media/Files/D/De-Beers-Group-V2/documents/sustainability-and-ethics/building-forever-sustainability-report-2022.pdf

163.    On February 29, 2024, De Beers and Sarine announced the collaboration between Tracr and Sarine to focus on recording technologically assured rough-to-polished diamond traceability ahead of the G7 nations' intentions to prohibit the importation of Russian diamonds.[41] As noted above (See ¶ 71), Sarine's Diamond Journey Traceability is identical to Tracr.[42]  Sarine offers machines such as "AutoScan Plus" for its traceability solution to mining companies, manufacturers and retailers such as the Aura Blockchain Consortium (which includes luxury groups LVMH[43], Prada, Richemont/Cartier and others), Lucara Diamonds, Burgundy Diamond Mines and Crossworks Manufacturing Ltd.

164.    The head of De Beers' Tracr, the CEO of Sarine, and the CEO of GCAL (a Sarine US subsidiary) confirmed that Sarine's Diamond Journey Traceability is identical to Tracr (the video shows the scanning process, mapping of physical features,  sets of triplets and rotation in virtual space).[44]

165.    Companies that have joined Tracr, and (to the extent they have any type of diamond mining, manufacturing or sales in the U.S.) therefore necessarily infringe Dr. Rady's '261 and '496 patents include: **Alrosa, AMC Daneel Diamond Ventures, Ankit Gems, Asian Star, Bonas Group, Brilliant Earth, Chow Tai Fook, Dharmanandan Diamonds, Diacore, Dianco, Diarough, Finestar Jewellery and Diamonds, Gemological Institute of America (GIA), Gemological Science International (GSI), Grandview Klein Diamonds, Hari Krishna Exports, Hasenfeld-Stein, IGC Group, Innovseed, Israel Diamond Exchange (IDEX), GCAL, Janai Jewellery, K Girdharlal International, KGK Group, Kiran Gems US, KP Sanghvi, Laxmi Diamond, Lexus SoftMac, Lieber & Solow co., Mahendra Brothers Export,**

---

[41]https://www.debeersgroup.com/news-insights/latest-group-news/2024/de-beers-group-confirms-readiness-for-new-g7-diamond-import-requirements

[42] https://www.youtube.com/watch?v=11DAWEjwdrg.

[43] Includes Louis Vuitton, Tiffany & Co, Christian Dior, Bvlgari, Tag Heuer, Chaumet and others.

[44] https://www.youtube.com/watch?v=11DAWEjwdrg

**Mohit Diamonds, Mountain Province Diamonds, Octonus, Pluczenik Diamond Company, RapNet Diamond and Jewelry, Rapaport, Rosy Blue, Sarine Technologies, Shairu Gems Diamonds, Sheetal Manufacturing Company, Signet Jewelers, SRK Exports, Star Rays, Tache NV, Stuller, Uni Diamonds, VD Global, Venus Jewel and Yerushalmi Bros Diamonds**.

166.    On information and belief, De Beers manufactures scanning machines and has also contracted with and/or invested in one or more machine manufacturing companies specifically for the large-scale manufacture of diamond scanning machines for distribution to Tracr participants throughout the world, including in the U.S. These scanning machines, whether manufactured by De Beers or by its approved machine producers, are registered by De Beers to access the Tracr platform. More specifically, on information and belief, De Beers provided detailed specifications to certain manufacturing companies for the diamond scanning machines required for participation in Tracr and which infringe Dr. Rady's '261 and '496 patents. These companies include Innovseed, Lexus SoftMac, Octonus, and Sarine. On information and belief, De Beers is importing infringing machines manufactured by De Beers, Innovseed, Lexus SoftMac, Octonus, and Sarine into the U.S., encouraging and/or directing Innovseed, Lexus SoftMac, Octonus, and Sarine to import infringing machines into the U.S., and/or encouraging and/or directing its customers and Tracr participants to import and/or use infringing machines manufactured by De Beers (such as RhoVol, DiamondProof, DiamondView, DiamondView Zoom, SynthDetect, AMS Micro and AMS2) and its approved machine producers into the U.S. Additionally, Tracr user documentation directs Tracr participants  to use scanning machines manufactured by Innovseed, Lexus SoftMac, Octonus, and Sarine that are approved by De Beers and registered to access Tracr.[45] Some of the machines produced by De Beers' approved machine producers include Diabot, Diabot NX, HeliumRough, HeliumPolished and AutoScan Plus. A video posted by De Beers on Vimeo, demonstrates how

---

[45] https://docs.tracr.com/docs/user-documentation/hm711585o5ed3-integration

diamonds are registered on Tracr using scanning machines manufactured by Innovseed and Diabot. The video shows that imperfections are captured to create a digital fingerprint. [46]

167. On May 22, 2024, De Beers and Signet (who joined Tracr in May 2018 – see ¶163 above) announced their collaboration for a marketing campaign to train Signet's 20,000 sales associates on promoting the story of natural diamonds and their responsible sourcing, upholding the integrity of the global diamond supply chain to a new generation of U.S. couples purchasing diamonds. Exhibit 28.

168. On May 30, 2024, De Beers' current CEO, Al Cook[47], posted his picture at the White House on LinkedIn, and said that more diamonds are bought in the US than in any other country and that one of his priorities is to work with the US government to ensure that De Beers Group's diamonds are welcomed with open arms and outstretched ring-fingers. Mr. Cook said he discussed with government officials how De Beers' tracks the journey of its diamonds all the way from mines and that De Beers' Tracr will enable people to map out the individual pathway from rough stone to polished beauty, not only meeting the new G7 import requirements, but also allow De Beers to share the diamond stories.[48]

169. In an interview on June 13, 2024, Mr. Cook said that 70% of De Beers production by value is on Tracr, enabling De Beers to tell the individual story of each diamond since it came out of the ground. In his interview, Mr. Cook expressed his excitement about the collaboration

---

[46] https://vimeo.com/1185210222

[47] On March 21, 2023, De Beers executives Al Cook, Feriel Zerouki and David Prager, filed a lobbying registration form to act as lobbyists to lobby the US government for diamond sourcing and provenance issues. They met with U.S. Ambassador James C. O'Brien and his team as part of the engagements related to the G7 sanctions on Russian diamonds and diamond importation requirements; https://www.jckonline.com/editorial-article/de-beers-lobbying-disclosure/

[48] https://www.linkedin.com/posts/al-cook-61849335_americans-are-a-diamonds-best-friend-more-activity-7201920252006313984-6O46/?utm_source=share&utm%E2%80%A6

with Signet whose 20,000 customer representatives can tell the story of each of De Beers' diamonds through Tracr to Signet's customers in the U.S.[49]

170.    In this Judicial District, De Beers is infringing Dr. Rady's '261 '496, '734, and '762 patents by using its diamond scanning machines in its U.S. retail stores, by importing and delivering in the U.S. and to Signet its diamond scanning machines for use in Signet's Kay Jewelers, Zales, Jared and Blue Nile brand retail stores, and/or by inducing Signet and others to import into the U.S. and/or use in the U.S. infringing diamond scanning machines by promoting the Tracr platform, promoting the use of infringing diamond scanning machines, and by training Signet's 20,000 customer representatives in the use of the Tracr platform and infringing diamond scanning machines.

171.    In an interview in February 2025, Wesley Tucker, head of De Beers' Tracr platform, confirmed that Tracr is expanding its midstream and downstream networks and that scanning machines are being delivered to miners, manufacturers and retailers for them to add their production to the Tracr platform.[50] Major diamond jewelry retailer Signet was specifically identified as downstream partner.

**ORIGYN's  and Pan Industrial's Infringement of Dr. Rady's Patents**

172.    Origyn's customers include holders of large inventories of second-hand luxury goods such as watches, jewelry, handbags, shoes, etc.[51] Origyn Foundation, a Swiss non-profit, promotes the use of Tracr, sometimes referred to as Origyn's Web 3.0-based Real World Asset ("RWA") infrastructure,  Origyn's RWA Certification Protocol, Origyn's real world asset authentication platform, or Origyn's digital twin authentication program, which requires the use

---

[49] https://rapaport.com/analysis/de-beers-ceo-on-lab-grown-diamonds-for-lightbox-polished-and-anglo-american/
[50] https://news.jewellerynet.com/uploads/ebook/jna/2025/January_2025/26/
[51] On information and belief, Origyn customers include Rolex, Omega, Audemars Piguet, Patek Philippe, WatchBox, Hermès, Chanel, Saint Laurent, eBay and International Gemological Institute (IGI).

of infringing scanning machines for authentication and certification of real world assets, throughout out the world, including in the U.S., and in this Judicial District. Origyn Research USA LLC offers for sale and sells in the U.S., including in this Judicial District, a desktop scanning machine called the Origyn Minting Box for creating digital fingerprints using the Tracr technology which was misappropriated from Dr. Rady. See ¶¶ 63-64 above, describing how BCG created Origyn to use the Tracr technology for authenticating and tracking second-hand luxury goods). These Origyn Minting Boxes are simply modified versions of the diamond scanning machines used for Tracr. While the Origyn Minting Boxes can be used to scan and fingerprint diamonds, they can also be used to scan and fingerprint second-hand luxury goods. The Origyn Minting Boxes manufactured, promoted, offered for sale and sold in this Judicial District and throughout the U.S. have a 3D scanner, a spectral imaging camera, and processors and software that use the 3D scan data and spectral data to identify and map the shape, imperfections, and other physical features of the scanned item to generate a unique identifier that is used by Tracr to determine whether one scanned item is the same as, part of, or different from another scanned item. See Rady v. BCG, et al. Complaint Video Folder Hyperlink, ORIGYN Biometric Certificates, How Certification Works for Luxury Objects video. Origyn's offer for sale and sale of the Origyn Minting Box constitute a direct infringement of Dr. Rady's '261,'496, '734, and '762 patents. Furthermore, Origyn's customers directly infringe Dr. Rady's '261 and '496 patents by using the Origyn Minting Box. Therefore, Origyn's promotion of Tracr, Origyn's RWA authentication platform, and the Origyn Minting Box constitutes inducement to infringe Dr. Rady's '261,'496, '734, and '762 patents. Stating that Origyn Foundation is a non-profit, BCG and Mike Schwartz formed Pan Industrial Platforms LLC, and Pan Industrial Services LLC to profit from the promotion and sale of Tracr and the Origyn Minting Box. Pan Industrial's offer for sale and sale of the Origyn Minting Box constitute a direct infringement of Dr. Rady's '261, '496, '734, and '762 patents. Furthermore, Pan

Industrial's customers directly infringe Dr. Rady's '261 and '496 patents by using the Origyn Minting Box. Therefore, Pan Industrial's promotion of Tracr and the Origyn Minting Box constitutes inducement to infringe Dr. Rady's '261, '496 '734, and '762 patents.

**De Beers Jewelers's Infringement of Dr. Rady's Patents**

173.    De Beers Jewelers exclusively sells De Beers-mined diamonds, scanned at the mine and re-scanned at De Beers Jewelers retail locations using diamond scanning machines to identify and track the diamonds. These diamond scanning machines are the same machines that De Beers Group imports or has imported into the U.S. for its Sightholders and customers. Each diamond scanning machine at De Beers Jewelers locations has at least a 3D scanner, a spectral imaging camera, a processor, and a memory that contains computer-readable instructions (software) that instructs the processor to use the 3D scan data and the spectral data to generate the unique signature identifying and mapping inclusions, occlusions, anomalies, imperfections, and other physical features, of each diamond.

174.    De Beers Jewelers' use of these diamond scanning machines constitutes an infringement of Dr. Rady's ''261, '496,'734, and '762 patents.

**Signet Jeweler's Infringement of Dr. Rady's Patents**

175.    Signet Jewelers is a De Beers Sightholder and owns a number of jewelry retail brands, including Kay Jewelers, Zales, Jared, and Blue Nile branded retail stores. Signet Jewelers imports De Beers' and/or its approved machine producers diamond scanning machines and distributes them to, and uses them in, its Kay Jewelers, Zales, Jared and Blue Nile retail stores. Each diamond scanning machine imported, distributed, and/or used by Signet Jewelers has at least a 3D scanner, a spectral imaging camera, a processor, and a memory that contains computer-readable instructions (software) that instructs the processor to use the 3D scan data and the spectral data to generate the unique signature identifying and mapping inclusions, occlusions, anomalies,

imperfections, and other physical features, of each diamond. Signet Jewelers' use of these high speed scanning machines constitutes an infringement of Dr. Rady's '261, '496, '734, and '762 patents.

**Anglo American's Infringement**

176.    Anglo American, De Beers' parent company, owns, promotes and operates "Valutrax," a Tracr clone marketed to mining and metals companies.[52] Anglo American also promotes "Valutrax," for tracking the provenance and ethical sourcing of its platinum jewelry. Exhibit 29, see ¶¶ 92-93 above. According to Anglo American's own documents, "Anglo American's digital traceability journey began in 2018, with De Beers' investment in Tracr™, the world's first fully distributed diamond traceability platform with the ability to explore the provenance and authenticity of a diamond."[53] As with Tracr, Valutrax relies upon scanning machines that generate irrefutable unique signatures for scanned items based on their inherent physical features. Anglo American imports into the U.S., offers for sale and or sells in the U.S., for use by U.S. participants, in Valutrax, including mining, smelting, refining and trading companies. Each scanning machine imported, used and/or distributed by Anglo American has at least a 3D scanner, a spectral imaging camera, a processor, and a memory that contains computer-readable instructions (software) that instructs the processor to use the 3D scan data and the spectral data to generate the unique signature identifying and mapping inclusions, occlusions, anomalies, imperfections, and other physical features, of each scanned physical item. By the end of 2023,

---

[52]    https://www.securingindustry.com/electronics-and-industrial/mining-giant-anglo-american-launches-traceability-system/s105/a15805/, ("The introduction of Valutrax is the latest stage in a traceability journey that started in 2018 with the development by its De Beers diamond mining subsidiary of Tracr, a blockchain system that tracks stones through the supply chain.")

[53] https://www.angloamerican.com/media/press-releases/2023/14-11-2023

according to Anglo American, one hundred customers had joined Valutrax, including Mitsubishi Materials Corporation, Aurubis, Jiangxi Copper.

177.    Therefore, Anglo American is also infringing Dr. Rady's patented invention, by offering for sale and selling in the U.S. the scanning machines required for participation in Anglo American's "Valutrax" traceability platform. Anglo American's promotion of the Valutrax traceability platform in the U.S. (which necessarily requires the use of infringing scanning machines, systems or methods) and active encouragement to infringe Dr. Rady's '261, '496, '734, or '762 patents constitutes inducement to infringe Dr. Rady's '261, '496, '734, or '762 patents.

## DAMAGES

178.    As a result of Defendants' acts of infringement, Dr. Rady has suffered and continues to suffer actual and consequential damages. However, Dr. Rady does not yet know the full extent of the infringement, and the amount of damages cannot be ascertained except through discovery and special accounting. To the fullest extent permitted by law, Dr. Rady seeks recovery of damages at least for reasonable royalties, lost profits, unjust enrichment, and benefits received by Defendants as a result of using Dr. Rady's patented technology. Dr. Rady further seeks any other damages to which he is entitled under law or in equity, including enhanced damages for Defendants' egregious conduct.

179.    To remedy any ongoing and/or future harm to Dr. Rady caused by Defendants' infringement, Dr. Rady seeks a preliminary and permanent injunction preventing any further infringement.

## COUNT I

### (DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,375,261)

180.    Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

181.    Without limiting the claims that will be asserted or the products and services that will be accused of infringement in this action, Dr. Rady asserts that at least claim 1 of the '261 patent is infringed by each of the defendants.

182.    The Origyn Minting Boxes or other scanning machines that Origyn Research USA LLC, Pan Industrial Platforms LLC, and Pan Industrial Services LLC are using, promoting, offering for sale and/or selling in the U.S. include every element set forth in claim 1 of the '261 patent. A claim chart illustrating Origyn's and Pan Industrial's infringement of claim 1 of the '261 patent is attached as Exhibit 30 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 30, Origyn's Minting Box meets each and every one of the claim limitations of at least claim 1 of the '261 patent, literally or under the doctrine of equivalents. Exhibit 30. Dr. Rady has not authorized such using, offering for sale and selling in the U.S. of his patented invention by Origyn or Pan Industrial.

183.    The diamond scanning machines that De Beers Group is importing into the U.S., and/or is using, offering for sale and/or selling in the U.S. directly or indirectly through it approved supplies include every element set forth in claim 1 of the '261 patent. A claim chart illustrating De Beers Group's infringement of claim 1 of the '261 patent is attached as Exhibit 31 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 31, De Beers Group's diamond scanning machines meet each and every one of the claim limitations of at least claim 1 of the '261 patent, literally or under the doctrine of equivalents. Exhibit 31 Dr. Rady has not authorized such importation, using, offering for sale or selling of his patented invention by the De Beers Group.

184.    The diamond scanning machines that Signet is importing into the U.S., distributing to, and/or using in its Kay Jewelers, Zales, Jared, and Blue Nile retail stores in the U.S., include every element set forth in claim 1 of the '261 patent. A claim chart illustrating Signet's

infringement of claim 1 of the '261 patent is attached as Exhibit 31 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 30, the diamond scanning machines imported, distributed and/or used by Signet meet each and every one of the claim limitations of at least claim 1 of the '261 patent, literally or under the doctrine of equivalents. Exhibit 31. Dr. Rady has not authorized such importation or use of his patented invention by Signet.

185.    The diamond scanning machines that De Beers Jewelers is using in its jewelry stores in the U.S. include every element set forth in claim 1 of the '261 patent. A claim chart illustrating De Beers Jewelers' infringement of claim 1 of the '261 patent is attached as Exhibit 31 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit309, the diamond scanning machines used by De Beers Jewelers meet each and every one of the claim limitations of at least claim 1 of the '261 patent, literally or under the doctrine of equivalents. Exhibit 31. Dr. Rady has not authorized the use of his patented invention by De Beers Jewelers.

186.    The scanning machines that Anglo American is importing into the U.S., is using, offering for sale and/or selling in the U.S. for use by participants in the Valutrax traceability platform include every element set forth in claim 1 of the '261 patent. A claim chart illustrating Anglo American's infringement of claim 1 of the '261 patent is attached as Exhibit 32 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 32, the scanning machines imported, using, selling and offering for sale by Anglo American meet each and every one of the claim limitations of at least claim 1 of the '261 patent, literally or under the doctrine of equivalents. Exhibit 32. Dr. Rady has not authorized such importing into, using, offering for sale or selling of his patented invention by Anglo American.

187.    Defendants' unauthorized development, promotion, use, offer to license, and/or license of Tracr and the Valutrax traceability solution in the United States, including the use of the

infringing scanning machines, constitutes an infringement of at least Claim 1, of the ''261 patent in violation of 35 U.S.C. § 271(a).

188.    Dr. Rady has been damaged by the Defendants' infringement of the '261 patent in an amount to be determined at trial.

189.    Upon information and belief, Defendants' infringement of the '261 patent has been willful.

## COUNT II

### (INDUCEMENT TO INFRINGE U.S. PATENT NO. 12,375,261)

190.    Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

191.    Upon information and belief, Defendants have actively induced infringement of the '261 patent without authority in violation of 35 U.S.C. § 271(b). Specifically, Defendants understand, intend, and encourage their products to be imported, offered for sale, sold or used in the United States, knowing they infringe at least one claim of the '261 patent.

192.    The customers of Origyn Research USA, Pan Industrial Platforms LLC, and Pan Industrial Services are directly infringing at least claim 1 of the '261 patent by using the Origyn Minting Box for real world asset authentication and traceability.

193.    Origyn Research USA, LLC, Pan Industrial Platforms LLC, Pan Industrial Services LLC are inducing others in the U.S. to infringe at least claim 1 of the '261 patent by actively encouraging others to participate in the Origyn real world asset authentication and traceability platform which requires the use of the Origyn Minting Box or other infringing scanning machines, knowing that the use by others of the Origyn Minting Box or other scanning machines directly infringe at least claim 1 of the '261 patent.

194.    The De Beers Group Tracr partners, including but not limited to Signet, that have enrolled in or otherwise participate in the Tracr program are directly infringing at least claim 1 of the '261 patent by using De Beers authorized diamond scanning machines.

195.    De Beers Group is inducing others in the U.S. to infringe claim 1 of the '261 patent by actively encouraging, directing, and promoting its subsidiaries De Beers Jewelers and others to use these diamond scanning machines, knowing that use of these diamond scanning machines directly infringes at least claim 1 of the '261 patent.

196.    The Anglo American partners that have enrolled in or otherwise participate in the Valutrax program are directly infringing at least claim 1 of the '261 patent by using Anglo American authorized scanning machines.

197.    Anglo American is inducing others in the U.S. to infringe claim 1 of the '261 patent by actively encouraging, promoting others to join, purchase, and/or use Valutrax in the U.S., which requires the use of the scanning machines that infringe at least claim 1 of the '261 patent, knowing that the use by others of these diamond scanning machines infringes claim 1 of the '261 patent.

## COUNT III

### (DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,401,496)

198.    Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

199.    Without limiting the claims that will be asserted or the products and services that will be accused of infringement in this action, Dr. Rady asserts that at least claim 1 of the '496 patent is infringed by each of the defendants.

200.    The Minting Boxes that Origyn Research USA LLC, Pan Industrial Platforms LLC, and Pan Industrial Services are  making, using, offering for sale and/or selling in the U.S. include every element set forth in at least claim 1 of the '496 patent. A claim chart illustrating Origyn's

and Pan Industrial's infringement of claim 1 of the '496 patent is attached as Exhibit 33 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 32, Origyn's Minting Box meets each and every one of the claim limitations of at least claim 1 of the '496 patent, literally or under the doctrine of equivalents. Exhibit 33. Dr. Rady has not authorized such making, offering for sale and/or selling in the U.S. of his patented invention by Origyn or Pan Industrial, and has not authorized Origyn's or Pan Industrial's customers to practice the invention of claim 1 of the '496 patent.

201. The diamond scanning machines that De Beers Group is importing into, using, offering for sale and/or selling the U.S. include every element set forth in at least claim 1 of the '496 patent. A claim chart illustrating De Beers Group's infringement of claim 1 of the '496 patent is attached as Exhibit 34 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 34, De Beers Group's diamond scanning machines meet each and every one of the claim limitations of at least claim 1 of the '496 patent, literally or under the doctrine of equivalents. Exhibit 34. Dr. Rady has not authorized such manufacturing, importing into, using, offering for sale and/or selling in the U.S. of his patented invention by the De Beers Group.

202. The diamond scanning machines that Signet has acquired from De Beers Group and/or its approved machine producers, is importing into the U.S., is distributing to, and/or using at its Kay Jewelers, Zales, Jared, and Blue Nile retail locations in the U.S. include every element set forth in at least claim 1 of the '496 patent. A claim chart illustrating Signet's infringement of claim 1 of the '496 patent is attached as Exhibit 34 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 34, Signet's diamond scanning machines meet each and every one of the claim limitations of at least claim 1 of the '496 patent, literally or under the doctrine of equivalents. Exhibit 34. Dr. Rady has not authorized such importation of his patented invention by Signet.

203.   The diamond scanning machines that De Beers Jewelers is using in its jewelry stores in the U.S. include every element set forth in at least claim 1 of the '496 patent. A claim chart illustrating De Beers Jewelers' infringement of claim 1 of the '496 patent is attached as Exhibit 34 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 34, De Beers Jewelers' diamond scanning machines meet each and every one of the claim limitations of at least claim 1 of the '496 patent, literally or under the doctrine of equivalents. Exhibit 34. Dr. Rady has not authorized the use of his patented invention by De Beers Jewelers.

204.   The scanning machines that Anglo American is importing into the U.S., using, offering for sale and/or selling in the U.S. for use by participants in the Valutrax traceability platform include every element set forth in at least claim 1 of the '496 patent. A claim chart illustrating Anglo American's infringement of claim 1 of the '496 patent is attached as Exhibit 35 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 35, Anglo American's scanning machines meet each and every one of the claim limitations of at least claim 1 of the '496 patent, literally or under the doctrine of equivalents. Exhibit 35. Dr. Rady has not authorized such importing into, using, offering for sale and selling of his patented invention by Anglo American.

205.   Defendants' unauthorized use, offer to license, and/or license of Tracr and the Valutrax traceability solution in the United States, including the use of the infringing scanning machines, constitutes an infringement of at least Claim 1 of the '496 patent in violation of 35 U.S.C. § 271(a).

206.   Dr. Rady has been damaged by the Defendants' infringement of the '496 patent in an amount to be determined at trial.

207.   Upon information and belief, Defendants' infringement of the '496 patent has been willful.

## COUNT IV

### (INDUCEMENT TO INFRINGE U.S. PATENT NO. 12,401,496)

208.    Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

209.    Upon information and belief, Defendants have actively induced infringement of the '496 patent without authority in violation of 35 U.S.C. § 271(b). Specifically, Defendants understand, intend, and encourage their products to be imported, offered for sale, sold or used in the United States, knowing they infringe at least one claim of the '496 patent.

210.    The customers of Origyn Research USA, Pan Industrial Platforms LLC, and Pan Industrial Services are directly infringing at least claim 1 of the '496 patent by using the Origyn Minting Box for real world asset authentication and traceability.

211.    Origyn Research USA LLC, Pan Industrial Platforms LLC, and Pan Industrial Services are inducing others in the U.S. to infringe at least claim 1 of the '496 patent, by actively encouraging others to participate in the Origyn real world asset authentication and traceability platform which requires the use of the Origyn Minting Box or other asset scanning machine , knowing that the Origyn Minting Box and other asset scanning machines directly infringe at least claim 1 of the '496 patent.

212.    The De Beers Group Tracr partners, including but not limited to Signet, that have enrolled in or otherwise participate in the Tracr program are directly infringing at least claim 1 of the '496 patent by using De Beers authorized diamond scanning machines.

213.    De Beers Group is inducing others in the U.S. to infringe at least claim 1 of the '496 patent, by actively encouraging, directing, and promoting its subsidiaries De Beers Jewelers to use these diamond scanning machines, in connection with its Tracr platform, knowing that the scanning machines directly infringe at least claim 1 of the '496 patent.

214. The Anglo American partners that have enrolled in or otherwise participate in the Valutrax program are directly infringing at least claim 1 of the '496 patent by using Anglo American authorized scanning machines.

215. Anglo American is inducing others in the U.S. to infringe at least claim 1 of the '496 patent, by actively encouraging and promoting others to join, purchase, and/or use Valutrax in the U.S., which requires the use of the scanning machines that infringe at least claim 1 of the '496 patent, knowing that the use of these scanning machines infringes at least claim 1 of the '496 patent.

**COUNT V**

**(DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,580,734)**

216. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

217. Without limiting the claims that will be asserted or the products and services that will be accused of infringement in this action, Dr. Rady asserts that at least claims 1 and 21 of the '734 patent are infringed by each of the defendants.

218. The Minting Boxes that Origyn Research USA LLC, Pan Industrial Platforms LLC, and Pan Industrial Services are making, using, offering for sale and/or selling in the U.S. include every element set forth in at least claim 1 of the '734 patent. A claim chart illustrating Origyn's and Pan Industrial's infringement of claim 1 of the '734 patent is attached as Exhibit 36 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 36, Origyn's Minting Box meets each and every one of the claim limitations of at least claim 1 of the '734 patent, literally or under the doctrine of equivalents. Exhibit 36. Dr. Rady has not authorized such making, offering for sale and/or selling in the U.S. of his patented invention by Origyn or Pan

Industrial, and has not authorized Origyn's or Pan Industrial's customers to practice the invention of claim 1 of the '734 patent.

219.    The diamond scanning machines that De Beers Group is importing into, using, offering for sale and/or selling the U.S. include every element set forth in at least claim 1 of the '734 patent. A claim chart illustrating De Beers Group's infringement of claim 1 of the '734 patent is attached as Exhibit 37 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 37, De Beers Group's diamond scanning machines meet each and every one of the claim limitations of at least claim 1 of the '734 patent, literally or under the doctrine of equivalents. Exhibit 37. Dr. Rady has not authorized such manufacturing, importing into, using, offering for sale and/or selling in the U.S. of his patented invention by the De Beers Group.

220.    The diamond scanning machines that Signet has acquired from De Beers Group and/or its approved machine producers, is importing into the U.S., is distributing to, and/or using at its Kay Jewelers, Zales, Jared, and Blue Nile retail locations in the U.S. include every element set forth in at least claim 1 of the '734 patent. A claim chart illustrating Signet's infringement of claim 1 of the '734 patent is attached as Exhibit 37 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 37, Signet's diamond scanning machines meet each and every one of the claim limitations of at least claim 1 of the '734 patent, literally or under the doctrine of equivalents. Exhibit 37. Dr. Rady has not authorized such importation of his patented invention by Signet.

221.    The diamond scanning machines that De Beers Jewelers is using in its jewelry stores in the U.S. include every element set forth in at least claim 1 of the '734 patent. A claim chart illustrating De Beers Jewelers' infringement of claim 1 of the '734 patent is attached as Exhibit 37 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 36, De Beers Jewelers' diamond scanning machines meet each and every one of the claim

limitations of at least claim 1 of the '734 patent, literally or under the doctrine of equivalents. Exhibit 37. Dr. Rady has not authorized the use of his patented invention by De Beers Jewelers.

222. The scanning machines that Anglo American is importing into the U.S., using, offering for sale and/or selling in the U.S. for use by participants in the Valutrax traceability platform include every element set forth in at least claim 1 of the '734 patent. A claim chart illustrating Anglo American's infringement of claim 1 of the '734 patent is attached as Exhibit 38 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 38, Anglo American's scanning machines meet each and every one of the claim limitations of at least claim 1 of the '734 patent, literally or under the doctrine of equivalents. Exhibit 38. Dr. Rady has not authorized such importing into, using, offering for sale and selling of his patented invention by Anglo American.

223. Defendants' unauthorized use, offer to license, and/or license of Tracr and the Valutrax traceability solution in the United States, including the use of the infringing scanning machines, constitutes an infringement of at least Claim 1 of the '734 patent in violation of 35 U.S.C. § 271(a).

224. Dr. Rady has been damaged by the Defendants' infringement of the '734 patent in an amount to be determined at trial.

225. Upon information and belief, Defendants' infringement of the '734 patent has been willful.

**COUNT VI**

**(INDUCEMENT TO INFRINGE U.S. PATENT NO. 12,580,734)**

226. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

227. Upon information and belief, Defendants have actively induced infringement of the '734 patent without authority in violation of 35 U.S.C. § 271(b). Specifically, Defendants understand, intend, and encourage their products to be imported, offered for sale, sold or used in the United States, and the methods claimed in the '734 patent to be performed in the United States, knowing they infringe at least one claim of the '734 patent.

228. The customers of Origyn Research USA, Pan Industrial Platforms LLC, and Pan Industrial Services are directly infringing at least claims 1 and 21 of the '734 patent by using the Origyn Minting Box for real world asset authentication and traceability.

229. Origyn Research USA LLC, Pan Industrial Platforms LLC, and Pan Industrial Services LLC are inducing others in the U.S. to infringe at least claims 1 and 21 of the '734 patent by actively encouraging others to participate in the Origyn real world asset authentication and traceability platform and to use the Origyn Minting Box or other infringing scanning machines in a manner that practices the methods of at least claims 1 and 21 of the '734 patent, knowing that such use directly infringes the '734 patent.

230. The De Beers Group Tracr partners, including but not limited to Signet, that have enrolled in or otherwise participate in the Tracr program are directly infringing at least claims 1 and 21 of the '734 patent by using De Beers authorized diamond scanning machines.

231. De Beers Group is inducing others in the U.S. to infringe at least claims 1 and 21 of the '734 patent by actively encouraging, directing, and promoting its subsidiaries De Beers Jewelers and others to use diamond scanning machines in a manner that practices the methods of at least claims 1 and 21 of the '734 patent, knowing that such use directly infringes the '734 patent.

232. The Anglo American partners that have enrolled in or otherwise participate in the Valutrax program are directly infringing at least claims 1 and 21 of the '734 patent by using Anglo American authorized scanning machines

233. Anglo American is inducing others in the U.S. to infringe at least claims 1 and 21 of the '734 patent by actively encouraging and promoting others to join, purchase, and/or use Valutrax in the U.S., which requires the use of scanning machines and methods that infringe the '734 patent, knowing that such use infringes the '734 patent.

## COUNT VII

### (DIRECT INFRINGEMENT OF U.S. PATENT NO. 12,683,762)

234. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

235. Without limiting the claims that will be asserted or the products and services that will be accused of infringement in this action, Dr. Rady asserts that at least claim 7 of the '762 patent are infringed by each of the defendants.

236. The Minting Boxes that Origyn Research USA LLC, Pan Industrial Platforms LLC, and Pan Industrial Services are making, using, offering for sale and/or selling in the U.S. include every element set forth in at least claim 7 of the '762 patent. A claim chart illustrating Origyn's and Pan Industrial's infringement of claim 7 of the '762 patent is attached as Exhibit 39 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 39, Origyn's Minting Box meets each and every one of the claim limitations of at least claim 7 of the '762 patent, literally or under the doctrine of equivalents. Exhibit 39. Dr. Rady has not authorized such making, offering for sale and/or selling in the U.S. of his patented invention by Origyn or Pan Industrial, and has not authorized Origyn's or Pan Industrial's customers to practice the invention of claim 7 of the '762 patent.

237. The diamond scanning machines that De Beers Group is importing into, using, offering for sale and/or selling the U.S. include every element set forth in at least claim 7 of the '762 patent. A claim chart illustrating De Beers Group's infringement of claim 7 of the '762 patent

is attached as Exhibit 40 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 40, De Beers Group's diamond scanning machines meet each and every one of the claim limitations of at least claim 7 of the '762 patent, literally or under the doctrine of equivalents. Exhibit 40. Dr. Rady has not authorized such manufacturing, importing into, using, offering for sale and/or selling in the U.S. of his patented invention by the De Beers Group.

238. The diamond scanning machines that Signet has acquired from De Beers Group and/or its approved machine producers, is importing into the U.S., is distributing to, and/or using at its Kay Jewelers, Zales, Jared, and Blue Nile retail locations in the U.S. include every element set forth in at least claim 7 of the '762 patent. A claim chart illustrating Signet's infringement of claim 7 of the '762 patent is attached as Exhibit 40 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 40, Signet's diamond scanning machines meet each and every one of the claim limitations of at least claim 7 of the '762 patent, literally or under the doctrine of equivalents. Exhibit 40. Dr. Rady has not authorized such importation of his patented invention by Signet.

239. The diamond scanning machines that De Beers Jewelers is using in its jewelry stores in the U.S. include every element set forth in at least claim 7 of the '762 patent. A claim chart illustrating De Beers Jewelers' infringement of claim 7 of the '762 patent is attached as Exhibit 40 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 40, De Beers Jewelers' diamond scanning machines meet each and every one of the claim limitations of at least claim 7 of the '762 patent, literally or under the doctrine of equivalents. Exhibit 40. Dr. Rady has not authorized the use of his patented invention by De Beers Jewelers.

240. The scanning machines that Anglo American is importing into the U.S., using, offering for sale and/or selling in the U.S. for use by participants in the Valutrax traceability platform include every element set forth in at least claim 7 of the '762 patent. A claim chart

illustrating Anglo American's infringement of claim 7 of the '762 patent is attached as Exhibit 41 and incorporated by reference as if fully set forth herein. As alleged herein and in Exhibit 41, Anglo American's scanning machines meet each and every one of the claim limitations of at least claim 7 of the '762 patent, literally or under the doctrine of equivalents. Exhibit 41. Dr. Rady has not authorized such importing into, using, offering for sale and selling of his patented invention by Anglo American.

241.    Defendants' unauthorized use, offer to license, and/or license of Tracr and the Valutrax traceability solution in the United States, including the use of the infringing scanning machines, constitutes an infringement of at least claim 7 of the '762 patent in violation of 35 U.S.C. § 271(a).

242.    Dr. Rady has been damaged by the Defendants' infringement of the '762 patent in an amount to be determined at trial.

243.    Upon information and belief, Defendants' infringement of the '762 patent has been willful.

**COUNT VIII**

**(CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 11,893,809 UNDER 35 U.S.C. § 256)**

244.    Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

245.    Dr. Rady is the sole inventor of the inventions claimed in U.S. Patent 11,893,809.

246.    Dr. Rady disclosed to Mr. Ravindran the invention claimed in U.S. Patent 11,893,809 during the course of several meetings in January and February 2018.

247.    Following Dr. Rady's disclosure of the invention claimed in the '809 patent to Mr. Ravindran, BCG and De Beers worked together to draft a patent application describing and

claiming the invention that Dr. Rady had disclosed to Mr. Ravindran and which is claimed in the '809 patent.

248.   On June 20, 2019, De Beers filed the patent application that it had worked on with BCG in the UK patent office, failing to name Dr. Rady as the inventor.

249.   The June 20, 2019, De Beers UK patent application incorrectly named Qi He Hong as the sole inventor.

250.   On May 21, 2020, De Beers filed the same patent application as a Patent Cooperation Treaty patent application in the European Patent Office, claiming priority from the June 20, 2019, De Beers UK patent application, again failing to name Dr. Rady as the inventor and incorrectly naming Qi He Hong as the sole inventor.

251.   On December 17, 2021, De Beers deposited the PCT application in the U.S. Patent and Trademark Office, again failing to name Dr. Rady as the inventor and incorrectly naming Qi He Hong as the sole inventor.

252.   The '809 patent was issued on February 26, 2024.

253.   On information and belief, Qi He Hong is not and has never been an employee of BCG or De Beers. On information and belief, Qi He Hong never worked, in any capacity, on BCG's Project Midnight. On information and belief, Qi He Hong never worked on Tracr for BCG or De Beers.

254.   On information and belief, Qi He Hong never conceived of the subject matter set forth in the '809 patent.

255.   On information and belief, De Beers persuaded Qi He Hong to allow his name to be used as inventor on the applications that led to the '809 patent instead of Dr. Rady.

## COUNT IX

### (CORRECTION OF INVENTORSHIP OF U.S. PATENT NO. 12,354,384 UNDER 35 U.S.C. § 256)

256. Dr. Rady incorporates by reference the allegations in the preceding paragraphs as if set forth fully herein.

257. Dr. Rady is the sole inventor of the inventions claimed in U.S. Patent No. 12,354,384.

258. Dr. Rady disclosed to Mr. Ravindran the invention claimed in U.S. Patent No. 12,354,384 during the course of several meetings in January and February 2018.

259. Following Dr. Rady's disclosure of the invention claimed in the '384 patent to Mr. Ravindran, BCG and De Beers worked together to draft a patent application describing and claiming the invention that Dr. Rady had disclosed to Mr. Ravindran and which is claimed in the '384 patent.

260. On June 20, 2019, De Beers filed the patent application that it had worked on with BCG in the UK patent office, failing to name Dr. Rady as the inventor.

261. The June 20, 2019, De Beers UK patent application incorrectly named Qi He Hong as the sole inventor.

262. On May 21, 2020, De Beers filed the same patent application as a Patent Cooperation Treaty patent application in the European Patent Office, claiming priority from the June 20, 2019, De Beers UK patent application, again failing to name Dr. Rady as the inventor and incorrectly naming Qi He Hong as the sole inventor.

263. On December 17, 2021, De Beers deposited the PCT application in the U.S. Patent and Trademark Office, again failing to name Dr. Rady as the inventor and incorrectly naming Qi He Hong as the sole inventor. That application eventually issued as the '809 patent.

264.    The '809 patent was issued on February 26, 2024.

265.    Just before the '809 patent was issued, De Beers filed a continuation application in the U.S. Patent and Trademark Office, again failing to name Dr. Rady as the inventor and incorrectly naming Qi He Hong as the sole inventor. That continuation application eventually issued as the '384 patent.

266.    The '384 patent was issued on July 8, 2025.

267.    On information and belief, Qi He Hong is not and has never been an employee of BCG or De Beers. On information and belief, Qi He Hong never worked, in any capacity, on BCG's Project Midnight. On information and belief, Qi He Hong never worked on Tracr for BCG or De Beers.

268.    On information and belief, Qi He Hong never conceived of the subject matter set forth in the '384 patent.

269.    On information and belief, De Beers persuaded Qi He Hong to allow his name to be used as inventor on the applications that led to the '384 patent instead of Dr. Rady.

## JURY DEMAND

270.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Dr. Rady respectfully requests that all issues and claims so triable be tried before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Rady prays for the following judgment and relief against Defendants:

A.    A judgment that the Defendants have infringed the '261 patent, the '496 patent, and the '734 patent;

B.    A preliminary and permanent injunction against Defendants and their affiliates, subsidiaries, assigns, employees, agents, and anyone acting in privity or concert with them, from infringing the '261, '496 and '734 patents;

C.      A judgment naming Dr. Rady as sole inventor of the '809 patent and the '384 patent;

D.      An award of all damages adequate to compensate Dr. Rady for Defendants' patent infringement;

E.      An award of treble damages as a result of Defendants' willful infringement of the '261 patent, the '496 patent, and the '734;

F.      An award of pre-judgement and post-judgment interest at the maximum rate allowed by law;

G.      An award finding that this is an exceptional case and awarding Dr. Rady his costs, expenses, disbursements, and reasonable attorneys' fees related to Defendants' patent infringement under 35 U.S.C. § 285 and all other applicable statutes, rules, and common law; and

H.      Such other relief, in law or in equity, as this Court deems just and proper.


Dated: July 14, 2026                          **WHITEFORD, TAYLOR & PRESTON LLC**

                                              */s/ Daniel A. Griffith*
                                              Daniel A. Griffith, Esquire (# 4209)
                                              600 North King Street, Suite 300
                                              Wilmington, Delaware 19801
                                              Telephone: (302) 357-3254
                                              Facsimile: (302) 357-3274
                                              Email: DGriffith@whitefordlaw.com

                                                  and

                                              Peter J. Davis, Esquire
                                              Steve Tiller, Esquire
                                              WHITEFORD, TAYLOR & PRESTON L.L.P.
                                              Seven Saint Paul Street, Suite 1500
                                              Baltimore, MD 21202-1636
                                               (410) 347-8700
                                              Email: pdavis@whitefordlaw.com
                                              stiller@whitefordlaw.com

                                              *(*Pro Hac Vice Forthcoming*)

- 84 -